UNITED STATES of America,
Plaintiff-Appellee,

v.

Beverly J. RAMSEY, Michael J. Marshall, Stuart A. McCreary, and James Joseph O'Donnell, Defendants-Appellants.

Nos. 85–1650, 85–1675, 85–1676 and 85–1677.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 17, 1986.

Decided Feb. 28, 1986.

As Amended on Denial of Rehearing and Rehearing En Banc April 9, 1986.

David A. Caulk, William R. Beu, P.C., Rockford, Ill., Paul E. Schaafsma, Sheila M. Murphy, Geary W. Kull, Chicago, Ill., for defendants-appellants.

Michael T. Mullen, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, and CUDAHY and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

The defendants in this case portray themselves as more gullible than the victims. The victims were taken in by promises of long-term million-dollar loans at 6% to 8% interest, loans they were told they would never have to pay back. Pie in the sky does not come cheap; victims paid as much as $7,500 for each $1 million of loan. The fees were to be "fully refundable" in the event the loans could not be made. No loan was made, no money refunded. After the scam had been in operation for more than a year, victims as a group had plunked down about $900,000 in cash in exchange for commitments to make some $500 million in loans.

The victims dealt with S.U.R.E., Inc. Michael Marshall was the President of SURE, Beverly Ramsey and Stuart McCreary were billed as executive assistants and negotiated the "deals," and James O'Donnell reassured clients that all was going well. The defendants say that they were "sure" that the loans would be made eventually and so are not criminally liable. The jury disagreed, and it convicted them of numerous counts of mail and wire fraud. See 18 U.S.C. §§ 1341, 1343, and 2314. Michael Marshall was given six years' imprisonment, plus five years' probation on condition that he make $285,000 in restitution. McCreary was sentenced to three years' imprisonment, five years' probation, and $40,000 in restitution. Ramsey received two years' imprisonment to be followed by five years' probation. O'Donnell was sentenced to six months' work release, four and a half years' probation, and $5,000 of restitution.

I

■ Marshall, who issued the instructions the other three defendants executed, does not challenge the sufficiency of the evidence. The other three do. SURE operated the same way throughout its brief life, and a single episode demonstrates that the evidence was sufficient when taken, as we must take it, in the light most favorable to the prosecution.

Robert Harvey of Bixby, Oklahoma, sold steel castings. He and his father decided to acquire a foundry to make their own product. Harvey concluded that he needed $7.5 million to buy the foundry, revamp its equipment, and have enough for working capital. He was unable to raise this money through ordinary channels, but a loan broker put him in touch with SURE, which was promising results in difficult cases. Harvey traveled from Oklahoma to Illinois on September 20, 1983, and spent two hours at SURE's office talking to McCreary, who said that SURE had two to three billion dollars of funds that could be made available at 8%. The money, according to McCreary, came from European sources, whose only alternative was to deposit cash in European banks that paid no or low interest; 8% was better than nothing.

McCreary told Harvey that SURE would wait until it had applications for about $50 million in loans, and then a lender would furnish that sum against a "world class prime note" to be issued by the borrowers and secured by their businesses. An offshore bank would assure the collateral to the lenders. McCreary stated that SURE was careful about assembling packages of borrowers and never had a package rejected by lenders. McCreary showed Harvey books of loan packages SURE had put together in the past.

The money SURE offered—$8.6 million at 8% per year—was attractive not only because it was larger than the value of the business but also because, according to McCreary, Harvey would never need to repay the principal. SURE would put $532,000 of the proceeds in a fund at a bank, and by the end of 20 years this fund would be large enough to pay the whole $8.6 million principal. Harvey would pay only the interest of $688,000 per year. This would be a boon for Harvey, because it would take $875,929 per year to amortize a $8.6 million loan at 8% interest over 20 years with a level-payment plan. SURE's proposal could work, however, only if the after-tax yield on the $532,000 would be 14.93%, compounded annually. Any lower rate of return would not produce enough to retire the $8.6 million principal in 20 years. McCreary did not explain why anyone would lend money to Harvey at 8% before tax when he could get 15% after tax from a bank.

Spectacular deals always seem to have a few catches. This deal had two. First, Harvey had to sign a "nondisclosure and noncircumvention agreement" promising not to tell anyone about the loan or to investigate where the money was coming from. Lenders wanted confidentiality, McCreary said. Second, Harvey had to put some cash up front. SURE wanted $12,900 for "loan packaging costs" and another

$51,600 to "purchase collateral" that was necessary for the closing. The $12,900 was to go to SURE, the remainder to Old Reserve Collateral Services, an institution in the Bahamas. In the event the loan did not close—something that McCreary said had never happened before—SURE would refund the money.

McCreary introduced Harvey to Marshall and Ramsey (who was described as the executive assistant for agricultural loans). Marshall said that Harvey could expect his money in six to eight weeks. Harvey returned to Oklahoma and sent checks for $12,900 and $51,600. A letter from Ramsey confirmed the approval of the application for a loan. After the eight weeks had passed, Harvey started checking the status of things. He called SURE three or four times a week, talking variously with McCreary, Ramsey, and O'Donnell.

In early March 1984 Harvey was told the loan would close in 10 days. Later that month O'Donnell said that SURE had a "new trust agent" and now was making progress, and McCreary said that SURE had obtained the second mortgage money needed to close. Ramsey said that several companies were competing for the package and that an Italian group was in the lead. Harvey was told that five other packages had just been approved by the European lenders. In April, O'Donnell told Harvey that Marshall had been in Zurich to close the loan, but that a London banker had had another commitment and had to leave the closing before the lender could arrive; things needed to be rescheduled. Plans changed. O'Donnell later said that the closing had been moved to Luxembourg, and still later O'Donnell said it had been shifted to the Bahamas. Then, O'Donnell said during a later call, the lenders backed out.

The peripatetic closing and the "lenders" never got to the same place at the same time. There were more calls, but there was no closing—not on Harvey's loan, not on any other loan. There were no lenders, no meetings with London bankers in Zurich, no prospects. There was also no re-

fund. Harvey never got his money back. Neither did any of the other 40 victims who testified at trial. A banker testified that there is no such thing as a "world class prime note," that money was unavailable to make risky loans (for more than 100% of the value of the collateral) in 1983 and 1984 at rates anything like 8% per year, that "nondisclosure and noncircumvention agreements" were unheard of, and that borrowers in legitimate transactions do not pay cash to offshore banks to help them "obtain collateral for the closing."

The transactions SURE proposed were fantasies. SURE proposed these unbelievable deals to desparate people who had been unable to obtain money from usual sources. Some desperate people are willing to believe things that cannot be true. The principal defense was that the defendants, too, believed. Marshall told Ramsey, McCreary, and O'Donnell that money would be forthcoming, and they believed him. Marshall's attorney said at oral argument that Marshall, too, relied on what other people told him. But none of the defendants offered a factual basis for these beliefs, which the jury was not required to credit.

▪ O'Donnell's further conclusion that he was a "mere employee," paid by the hour rather than by a percentage of SURE's take, does not help him. O'Donnell took money from Marshall for calming the victims, the better to prolong the operation. Nothing in the statutes requires that a defrauder get rich (or even accept money) as an element of liability. O'Donnell's terms of compensation apparently were satisfactory to him, and hourly employees are liable just as surely as defrauders who work on the piece-rate system.

## II

▪ The statutes under which the defendants were charged prohibit knowing misrepresentations in interstate transactions. Because the defendants contended that they had been bilked along with their clients, the district court gave an "ostrich" instruction based on instruction 4.05 from

the Seventh Circuit's *Manual on Jury Instructions in Federal Criminal Cases* (1965). The instruction the court gave provides:

> The word "knowingly" ... means that the act (or omission) was done voluntarily and purposely, and not because of mistake or accident. Knowledge may be proven by the defendant's conduct, and by all the facts and circumstances surrounding the case. No person can intentionally avoid knowledge by closing his or her eyes to facts which should prompt him or her to investigate.

The revision of the instruction on knowledge in the 1980 version (*Federal Criminal Jury Instructions of the Seventh Circuit* § 6.04) omits the point that the jury may infer knowledge from deliberate ignorance when the circumstances call for investigation. The notes of the advisory committee that recommended the revisions of 1980 do not indicate why the ostrich instruction was dropped.

The defendants say that we should dispatch the instruction because it coerces people to testify. By focusing the jurors' attention on the facts known to the defendant and the type of investigation the defendant carried out, the instruction puts pressure on the defendant to explain what he knew and how far he investigated. This attributes too much to the instruction. The pressure to testify comes from the evidence, not from the instruction. Whenever the prosecution's case is strong, the defendant must testify or face the risk that the jury will act on the only evidence before it. This sort of pressure to testify is permissible. See *McGautha v. California,* 402 U.S. 183, 213–20, 91 S.Ct. 1454, 1470–74, 28 L.Ed.2d 711 (1971); *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). See generally Peter Westen, *Incredible Dilemmas: Conditioning One Constitutional Right on the Forfeiture of Another,* 60 Iowa L.Rev. 741 (1981).

An ostrich instruction informs the jury that actual knowledge and deliberate avoidance of knowledge are the same thing.

When someone knows enough to put him on inquiry, he knows much. If a person with a lurking suspicion goes on as before and avoids further knowledge, this may support an inference that he has deduced the truth and is simply trying to avoid giving the appearance (and incurring the consequences) of knowledge. Alternatively the evidence could support an inference of criminal recklessness, which is the legal equivalent of knowledge. See *Duckworth v. Franzen,* 780 F.2d 645, 652–53 (7th Cir. 1985); *Sunstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1040 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977). When a mistaken assertion is very likely to mislead and to cause damage, and the defendant knows of this risk yet could have avoided the harm at no (or trivial) cost by checking up on facts within his reach, we call the omission to investigate criminal recklessness. An ostrich instruction points the jury in the right direction without dwelling on the fine details of recklessness. Every court of appeals has approved one or another version of an ostrich instruction. E.g., *United States v. MacKenzie,* 777 F.2d 811, 818–19 (2d Cir.1985); *United States v. Glick,* 710 F.2d 639 (10th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 995, 79 L.Ed.2d 229 (1984); *United States v. Cincotta,* 689 F.2d 238 (1st Cir.), *cert. denied,* 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982); *United States v. Restrepo-Granda,* 575 F.2d 524 (5th Cir.), *cert. denied,* 439 U.S. 935, 99 S.Ct. 331, 58 L.Ed.2d 332 (1978); *United States v. Jewell,* 532 F.2d 697 (9th Cir.) (en banc), *cert. denied,* 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976).

We have held that instruction 4.05 from the 1965 pattern jury instructions is a permissible charge. E.g., *United States v. Touloumis,* 771 F.2d 235, 243–44 (7th Cir. 1985); *United States v. Josefik,* 753 F.2d 585, 589 (7th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 2117, 85 L.Ed.2d 481 (1985); *United States v. Petullo,* 709 F.2d 1178, 1181 (7th Cir.1983); *United States v. Lynch,* 699 F.2d 839, 843 (7th Cir.1982); *United States v. Burns,* 683 F.2d 1056, 1059–61 (7th Cir.1982), *cert. denied,* 459

U.S. 1173, 103 S.Ct. 821, 74 L.Ed.2d 1018 (1983); *United States v. Gabriel,* 597 F.2d 95, 100 (7th Cir.), *cert. denied,* 444 U.S. 858, 100 S.Ct. 120, 62 L.Ed.2d 78 (1979); *United States v. Muscarella,* 585 F.2d 242, 252 (7th Cir.1978); *United States v. Prewitt,* 553 F.2d 1082, 1087 (7th Cir.), *cert. denied,* 434 U.S. 840, 98 S.Ct. 135, 54 L.Ed.2d 104 (1977); *United States v. Johnson,* 515 F.2d 730 (7th Cir.1975); *United States v. Joyce,* 499 F.2d 9, 23 (7th Cir.), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974); *United States v. Grizaffi,* 471 F.2d 69, 75 (7th Cir.1972), *cert. denied,* 411 U.S. 964, 93 S.Ct. 2142, 36 L.Ed.2d 684 (1973). These decisions reject every plausible challenge to instruction 4.05 and many implausible challenges. It is far too late for a panel of this court to hold, as the defendants request, that the giving of the instruction is reversible error.

There is nonetheless an undercurrent of dissatisfaction with the instruction. We called it "somewhat opaque" in *Burns, supra,* 683 F.2d at 1061. Last year we suggested several preferable formulations in *Josefik, supra,* 753 F.2d at 589. The problem with instruction 4.05 is that however useful the idea of inferring knowledge from studied ignorance may seem to judges, it is an unusual concept for a lay juror. Most jurors encounter the arcane language of instructions infrequently— maybe only once in a lifetime—and it is therefore important to give them instructions that do not require scholastic glossators to impart meaning. See *United States v. Burke,* 781 F.2d 1234, 1240–41 (1985).

The curt sentence "No person can intentionally avoid knowledge by closing his or her eyes to facts which should prompt him or her to investigate" does not fully convey to the jury the central point—that a person who has enough knowledge to prompt an investigation and then avoids further knowledge really does "know" all that the law requires. This sentence also does not help the jury to understand that it takes a fairly large amount of knowledge to prompt further investigation for the purpose of this instruction; to permit an inference of knowledge from just a little suspicion is to relieve the prosecution of its burden of showing every element of the case beyond a reasonable doubt. Other circuits therefore have required more complete explanations of this principle (see the cases cited at page 189). We said in *Josefik* that "small differences in the wording of instructions will rarely have such impact on the jury as to warrant reversal" (753 F.2d at 589), a principle fortified by Fed.R. Crim.P. 52(a) and 28 U.S.C. § 2111. But federal courts should be able to do better than continuously repeat an instruction that is opaque and unhelpful to jurors. There are goals higher than seeing "not reversible error" in an appellate opinion.

The last sentence of instruction 4.05 is obscure. It is better to use an instruction that tells the jury in plain language the role of intentional avoidance of knowledge. The model instruction in 1 Devitt & Blackmar, *Federal Jury Practice and Instructions* § 14.09 (3d ed. 1977), is more understandable, although it has turgid passages and too many ocular metaphors.* A simple, but sufficient, instruction would be: "You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used that word." See Perkins & Boyce, *Criminal Law* 401 (3d ed. 1984). Either this brief instruction or the longer one

---

* This instruction states: "The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him. A finding beyond a reasonable doubt of a conscious purpose to avoid enlightment would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact. It is entirely up to you as to whether you find any deliberate closing of the eyes, and the inference to be drawn from any such evidence. A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge."

from Devitt & Blackmar would tell the jury the purpose of drawing the inference and the factual basis necessary to support it. Everyone would gain from substituting a more complete explanation for the opaque sentence found in an outdated set of injury instructions. The giving of instruction 4.05 may not be reversible error, but it is certainly not a good idea. Instruction 6.04 from the pattern instructions now in effect, plus a separate ostrich instruction is appropriate, is much the better combination. We do not require the giving of any particular instruction or combination, but we commend these new possibilities to the good judgment of the district judges.

Our 1980 pattern instructions omit any ostrich charge, which suggests that as a rule the subject should be left to argument by counsel rather than formal instructions from the judge. But instructions sometimes may be provident, and the defendants' pleas of gullibility made it appropriate to give an ostrich instruction in this case. Three defendants contend that the instruction interacted with a limitation on their cross-examination to produce an untoward result. The FBI investigated SURE before the grand jury returned an indictment. Counsel for the defendants used the length of the investigation to advantage in the closing arguments. If it took the FBI more than six months to show that SURE's promises were fraudulent, counsel argued, how could O'Donnell, Ramsey, and McCreary have been expected to learn the truth about Marshall's representations to them? Counsel also sought to cross-examine the victims about what they knew of the FBI's investigation. The district judge prevented this line of inquiry, and we agree with him that it was irrelevant. What the victims knew or inferred about SURE from what the FBI told them has nothing to do with the question whether O'Donnell, Ramsey, and McCreary knew that they were dispensing fiction. The court was entitled to cut off the irrelevant questions. Fed.R.Evid. 402; cf. Fed.R. Evid. 403.

## III

1. The victims testified to many statements of the four defendants, and each statement was introduced against all. The defendants say that this was improper because the conspiracy was not established by sufficient non-hearsay evidence. Marshall cannot make this argument because the other three defendants were his employees at SURE, and a "statement by his agent or servant concerning a matter within the scope of his agency or employment" is admissible without regard to the existence of a conspiracy. Fed.R.Evid. 801(d)(2)(D). The co-conspirator declaration rule of Rule 801(d)(2)(E) supplies the basis for the use of the statements against the other three defendants. The evidence that the four defendants were embarked on a common scheme was overwhelming. They worked from a single office under a common name. They introduced each other to victims by name and title. Many victims dealt with all four defendants, who were aware of earlier events in the course of each victim's encounter with SURE. The district court was entitled to find, as it did, that there was a conspiracy and that these four people belonged to it.

That the district court made this decision six witnesses into the trial is not important. Although it is preferable to settle such matters before trial, see *United States v. Santiago,* 582 F.2d 1128 (7th Cir. 1978), a judge may decide to admit testimony subject to a later ruling, if that is the best way to handle a particular case. A belated decision may cause difficulties if the judge then determines that the evidence does not establish a conspiracy, but there was no such problem here. See generally *United States v. Xheka,* 704 F.2d 974 (7th Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983).

2. The defendants protest the use of what they depict as "other crime" evidence. The district court allowed the prosecutor to prove that Marshall and James Coutts, SURE's attorney, induced Leland Barby, one of the victims, to part with an extra $100,000 in order to close a loan for

which Barby had already paid SURE $62,-250 in "refundable" fees. Barby never saw the $162,250 again. The court also admitted a transcript of Marshall's appearance before the grand jury; during his testimony Marshall claimed to be an attorney, with a degree from LaSalle University in Chicago. Evidence at trial showed that Marshall took some correspondence courses from LaSalle in 1969 and 1970, but he received no degree, and the degree to which these courses pertained would not have entitled Marshall to become a lawyer. He is not a member of any bar.

Rule 404(b) states that evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Both the Barby transaction and Marshall's claim to be a lawyer were pertinent to issues other than establishing that Marshall had a bad character. The Barby transaction was part of SURE's operation. Barby was a victim, and the additional $100,000 transaction was simultaneously part of the scheme and a method of keeping Barby quiet by showing how SURE was hard at work to close the loan. The claim of membership in the bar verified other evidence showing that Marshall gulled the victims in part by pretending expertise. The wall of his office at SURE sported a "degree" in law, and Marshall told many victims that he was a lawyer. This was one of the devices by which a con man obtained and kept the confidence of fleecees. The testimony before the grand jury demonstrated how much a part of Marshall's persona was his description of himself as a lawyer. The evidence showed the bad acts in a clear and convincing manner and was admissible under the approach our court uses. See *United States v. Liefer*, 778 F.2d 1236, 1240–44 (7th Cir.1985).

3. Robert Harvey kept a record of his calls to SURE on a desk calendar. The court allowed this calendar into evidence as a business record, citing Fed.R.Evid. 803(6). That rule states that a "memorandum, re-port, [or] record ... made at or near the time ... if kept in the course of a regularly conducted business activity" may be admitted without regard to the hearsay rule "if it was the regular practice of that business activity to make the" record or report in question. Harvey apparently started taking notes on his desk calendar to keep track of his calls to SURE. He kept a few, but not many, other notes on the calendar. The government argues that because Harvey had a "regular business" of selling steel castings—and soon acquired the regular business of calling SURE—the calendar was admissible.

■■■■ Miscellaneous jottings should not be admitted under Rule 803(6) just because they have some connection with a regular business. The idea behind Rule 803(6) is that when a record is kept with sufficient regularity, the existence of an entry (or the absence of one) is good evidence that the thing in question took place (or did not take place). Business records are reliable to the extent they are compiled consistently and conscientiously. Occasional desk calendars, in which entries may or may not appear at the whim of the writer, do not have the sort of regularity that supports a reliable inference. This is not to say that desk calendars never may be business records; they may, if they are maintained regularly, without regard to the events subject to the trial, and there is a demonstrable pattern of inclusion or exclusion. See *United States v. McPartlin*, 595 F.2d 1321 (7th Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979); *United States v. Hedman*, 630 F.2d 1184 (7th Cir.1980). Harvey's note-taking evidently was prompted by his desire to record his dealings with SURE, however, and this is not the sort of regularity that allows a court to treat the document as a business record.

■■■■ Harvey's calendar should have been used, if at all, as a recorded recollection under Rule 803(5). Under this rule a contemporaneous record may be "read into evidence but may not itself be received as an exhibit unless offered by an adverse party." Harvey testified, so that the desk

calendar could have been "read into evidence" under Rule 803(5) if his memory was "insufficient," which the rule requires. The difference between reading the calendar into evidence and introducing it as an exhibit is too small to be a reversible error in a trial of this complexity. It is inconceivable that the outcome of this case turns on so fine a distinction. The error was harmless.

## IV

We are left with the inevitable claims of ineffective assistance of counsel. These come in two varieties.

1. All four defendants appeared before the grand jury that investigated SURE. All four were advised of their privilege against compulsory self-incrimination. All chose to testify. All admitted to the grand jury that SURE never closed a loan, and these admissions were used against them at trial. Marshall also told the grand jury he is a lawyer, a statement used against him at trial. All four now say that these admissions should have been suppressed because they were represented before the grand jury by James Coutts. Coutts drew up legal papers for SURE and shared its offices. He apparently represented Marshall in other matters as well. He was not indicted for his role in SURE, but he has since surrendered his membership in the Illinois bar. The defendants say that Coutts had a hopeless conflict of interest. They do not explain exactly what the conflict was, but Marshall seems to think that Coutts was looking out for himself, the other three defendants that Coutts was looking out for Marshall.

So far as the record discloses, all four defendants willingly took advantage of Coutts's services. He advised all four to tell the truth before the grand jury but did not otherwise "prepare" them as witnesses. The position appears to be that had the prosecutor (or the court) moved to disqualify Coutts, the witnesses would have been forced to retain separate counsel, who either would have persuaded them to decline to testify or would have helped them to testify without aiding the investigation.

■■■ Disqualification of counsel in a criminal case is risky business. Whenever the prosecutor (or the court on its own motion) seeks to disqualify a lawyer, this raises difficult questions under the sixth amendment. There is no "mandatory disqualification" rule; even at a trial defendants may proceed with a lawyer subject to a conflict of interest. *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). When, as here, the only prejudice resulting from the failure of a court to raise disqualification issues is that suspects freely testified before the grand jury, there is no ground of complaint. The sixth amendment does not come into play until after the suspect becomes an "accused." *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). There is therefore no right to counsel before the grand jury, *In re Klein*, 776 F.2d 628, 633 (7th Cir.1985), and perforce no right under the sixth amendment to conflict-free counsel.

■■■ The right of a witness to counsel before a grand jury must be based on the fifth rather than the sixth amendment. It is "a right under the due process clause to be free of unjustified interference by the government in a private arrangement between client and lawyer." *In re Schmidt*, 775 F.2d 822, 824 (7th Cir.1985). The witness has a weaker right to counsel than does a party in a civil case, for the lawyer may not accompany the witness into the grand jury room or examine other witnesses. And even in a civil or administrative proceeding, regulation of the use of counsel is permissible. *Walters v. National Association of Radiation Survivors*, —— U.S. ——, 105 S.Ct. 3180, 3191–96, 87 L.Ed.2d 220 (1985). The prosecutor did not interfere with anyone's right to retain and secure advice from counsel of choice. Just as a civil litigant has no obligation to protect its adversary from an improvident choice of counsel, the prosecutor did not need to ensure that the witnesses before the grand jury obtained good advice from conflict-free counsel. The prosecutor did not hinder the defendants' choice of counsel or induce a conflict (or otherwise subvert) the counsel they chose, and the testi-

mony the witnesses gave therefore is untainted by constitutional error.

■ 2. Marshall insists that he was inadequately represented at trial. At the close of the prosecution's case, his lawyer rested. It must be ineffective assistance, Marshall maintains, to put on no defense at all. Not so. Something *can* be worse than nothing. An incredible defense may lead the judge to augment the punishment. *United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978). It may expose the defendant and his witnesses to punishment for perjury. When there is "no *bona fide* defense to the charge, counsel cannot create one and may disserve the interest of his client by attempting a useless charade." *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 2045 n. 19, 80 L.Ed.2d 657 (1984) (rejecting a claim that a lawyer who put on no defense was ineffective). See also *United States v. Bailey*, 734 F.2d 296, 306 (7th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 327, 83 L.Ed.2d 263 (1984). The right to effective assistance is the right "to require the prosecution's case to survive the crucible of meaningful adversarial testing." 104 S.Ct. at 2045. See also *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Marshall does not suggest that his lawyer failed to force the prosecutor to his proof or that his lawyer overlooked any effective line of defense. The sixth amendment does not require the impossible; when there is no legitimate defense, a lawyer can do little.

Marshall's appellate counsel suggested that Marshall might have testified that he had been duped by still other people, who led Marshall to believe that the loans eventually would close. It is easy to see why trial counsel might have been skeptical. It would not have explained why the victims were told that SURE had closed other loan packages, why they were given vivid but imagined scenes of London bankers huffing out of Zurich meetings to keep other appointments, why no one received a penny of the "refundable" fees back. In other words, it would not have been a colorable defense to the charges in the indictment, and it would have exposed Marshall to ridicule and perhaps increased his sentence.

The brief filed by Marshall's appellate counsel says that trial counsel gave a silly reason for not calling Marshall as a witness: that his testimony would allow the prosecutor to introduce evidence that he had claimed to be a lawyer. That is loony, appellate counsel says, because Marshall's perjurious claim to be a lawyer came out during the government's case. Even if this were the only reason counsel had for not putting on a defense, it would not suggest incompetence. Counsel may have thought that the prosecutor's use of the grand jury material was reversible error and that Marshall's testimony, by offering a legitimate opportunity to use the material, would have obviated the error. We do not know, however, why counsel did what he did, because Marshall never offered evidence on that subject. Appellate counsel does not suggest that there is any additional evidence Marshall would like to produce in the future. He therefore has not substantiated his claim that counsel bypassed a bona fide defense or made an unreasoned decision. Cf. *United States v. Brown*, 739 F.2d 1136, 1144–45 & n. 7 (7th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 331, 83 L.Ed.2d 268 (1984); *United States v. Lang*, 644 F.2d 1232, 1240 (7th Cir.), *cert. denied*, 454 U.S. 870, 102 S.Ct. 338, 70 L.Ed.2d 174 (1981).

Marshall has filed an additional brief pro se. This brief asserts that "[o]ver my protestations, based on his misunderstanding of the law, [trial counsel] simply wouldn't allow me to take the stand." A defendant has a "personal constitutional right to testify truthfully in his own behalf, [a right that] may not be waived by counsel as a matter of trial strategy." *United States v. Curtis*, 742 F.2d 1070, 1076 (7th Cir.1984). Marshall had, but bypassed, an opportunity to support such a claim in the district court. Nothing in the record supports the asser-

tion that counsel thwarted Marshall's desire to testify. To the contrary, the district judge asked Marshall during the trial whether he wanted to testify.

> THE COURT: I would like to ask each defendant [about the decision not to testify]. Mr. Marshall, you understand that you have a right to take the stand?

> DEFENDANT MARSHALL: Yes, your Honor, I do.

> THE COURT: And are you waiving that right to take the stand, is that right?

> DEFENDANT MARSHALL: Yes, sir.

> THE COURT: And has [your lawyer] explained to you that right and all the other rights connected with it?

> DEFENDANT MARSHALL: Yes, your Honor.

Marshall has no great respect for the truth. He operated a large-scale confidence operation, he lied to a grand jury, and either he lied at trial about his desire to testify or he is lying to this court. We do not think he has made a case of ineffective assistance. If counsel discouraged Marshall from testifying, that may have had something to do with counsel's concern about the veracity of the proposed testimony.

AFFIRMED.

### On Petition for Rehearing

The petition for rehearing correctly points out that there has not been an evidentiary hearing in the district court concerning Marshall's claim of ineffective assistance of counsel. It does not follow, however, that the record was inadequate to assess Marshall's claim. Counsel asserted on appeal that it is ineffective assistance of counsel not to put in a defense; that is incorrect, and it is possible to reject such a claim of ineffectiveness based only on what is before us in the record on appeal. This does not mean that Marshall could not prove his claim. It means only that, so far, he has not done so. Nothing in our opinion precludes Marshall from filing a motion under 28 U.S.C. § 2255 and adducing the sort of evidence we said was missing on this appeal. See *United States v. Lang*, 644 F.2d 1232, 1240 (7th Cir.), *cert. denied*, 454 U.S. 870, 102 S.Ct. 338, 70 L.Ed.2d 174 (1981).