In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 17-1521

C. S., by her parents as next friends,*

*Plaintiff-Appellant,*

*v.*

MADISON METROPOLITAN SCHOOL DISTRICT,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:15-cv-00570 — **Barbara B. Crabb**, *Judge.*

_____

ARGUED FEBRUARY 5, 2019 — DECIDED MAY 10, 2022

_____

Before SYKES, *Chief Judge*, and FLAUM, EASTERBROOK, MANION, KANNE, ROVNER, WOOD, HAMILTON, BRENNAN, SCUDDER, and ST. EVE, *Circuit Judges*.†

---

* The complaint uses "Jane Doe No. 55" to conceal plaintiff's name. We have substituted her initials in light of Fed. R. Civ. P. 5.2(a)(3).

† Associate Justice Barrett heard argument in this appeal while she was a member of this Court. She did not participate in the decision. Circuit

SCUDDER, *Circuit Judge*. Title IX prohibits discrimination on the basis of sex in educational settings. In *Gebser v. Lago Vista Independent School District*, the Supreme Court held that a victim of such discrimination may recover money damages from her school only where "an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." 524 U.S. 274, 277 (1998).

This two-pronged standard—requiring both actual notice and deliberate indifference—is difficult to meet, and it has proven equally challenging for courts to articulate in clear and practical terms. We took this case en banc to reconcile some inconsistencies in our case law regarding the interplay between *Gebser*'s two requirements and to provide more concrete guidance to those tasked with complying with Title IX in the challenging settings of today's schools.

Reinforcing *Gebser*'s central instruction, we hold that the relevant school official acquires actual notice upon learning that misconduct rising to the level of sex discrimination has occurred. Only then does Title IX impose an obligation to act. Contrary to suggestions in some of our past cases, Title IX does not permit institutional liability based solely on knowledge of the risk of future misconduct. Applying this framework to C.S.'s claim of sexual harassment, we affirm the entry of summary judgment for the school district.

---

Judges Kirsch and Jackson-Akiwumi joined the Court after oral argument and did not participate in the consideration or decision of the appeal.

**I**

A

Title IX of the Education Amendments of 1972 provides that "[n]o person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has explained that Congress intended Title IX to serve two purposes: "to avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979). And that latter purpose led the Court in *Cannon* to hold that Title IX contains an implied cause of action "in favor of private victims of discrimination," *id.* at 704–06, 709, enforceable in a suit for money damages. See *Franklin v. Gwinnett County Public Schs.*, 503 U.S. 60, 76 (1992).

But so, too, is the implied cause of action limited by Title IX's statutory design. Congress enacted Title IX pursuant to its authority under the Spending Clause, U.S. Const. art. 1, § 8, cl. 1, leaving the statute to operate "'much in the nature of a contract: in return for federal funds, the [recipients of those funds] agree to comply with federally imposed conditions.'" *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640 (1999) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Accordingly, "the legitimacy of Congress' power to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on whether the recipient voluntarily and knowingly accepts the terms of that 'contract.'" *Cummings v. Premier Rehab Keller, P.L.L.C.*, No. 20-219, slip op. at 4 (U.S. Apr. 28, 2022) (cleaned up). In the case of

Title IX, the terms are clear: a school district accepting federal funds promises to not use those funds to discriminate on the basis of sex. See *Gebser*, 524 U.S. at 286, 292.

Because Title IX's prohibition on sex discrimination comes as a bargained-for condition rather than an "outright prohibition," *id.* at 286, it follows that liability can attach only when the recipient of federal funds breaks its contractual promise not to "us[e] the funds in a discriminatory manner." *Id.* at 292. And a recipient can be said to break that promise, the Court in *Gebser* held, only when it *knows* that discrimination has occurred and fails to take reasonable action in response. See *id.* at 290–91.

In so holding the Court rejected the possibility that a Title IX plaintiff could collect damages "on principles of constructive notice or *respondeat superior*," because either theory would impose liability in cases where "the recipient of funds was unaware of the discrimination." *Id.* at 287. Instead, the Court explained, liability may attach only where a court can be sure "that the grantee was aware that it was administering the program in violation of the [condition]." *Id.* (quoting *Guardians Ass'n v. Civil Serv. Comm'n of New York City*, 463 U.S. 582, 598 (1983)) (alteration in *Gebser*).

With these principles in mind, *Gebser* set out two prerequisites for institutional liability under Title IX. *First*, "an official of the recipient entity with authority to take corrective action to end the discrimination" must have "*actual knowledge* of discrimination in the recipient's programs." *Id.* at 290 (emphasis added). *Second*, the official's "response [to that knowledge] must amount to deliberate indifference to discrimination" reflecting "an official decision by the recipient [entity] not to remedy the violation." *Id.* Together these requirements ensure

that a recipient is liable in money damages only "for its own official decision" to break its contractual promise not to discriminate. *Id.* at 291. In this sense, the two-prong *Gebser* framework permits Title IX institutional liability only where "the funding recipient engages in intentional conduct that violates the clear terms of the statute." *Davis*, 526 U.S. at 642.

B

Implicit in *Gebser*'s two requirements is an embedded, antecedent condition for Title IX liability: that the recipient's actual knowledge and deliberate indifference concern *completed or ongoing violations* of Title IX's prohibition on discrimination. See *id.* at 643 (explaining that Title IX liability attaches "where the recipient is deliberately indifferent to *known acts* of teacher-student discrimination") (emphasis added). If the conduct of which the school district becomes aware does not itself amount to sex-based discrimination, the school cannot have the requisite "notice that it will be liable for a monetary award" under Title IX if it fails to take corrective action. *Gebser*, 524 U.S. at 287 (quoting *Franklin*, 503 U.S. at 74). No doubt the observation is something of a truism—Title IX liability can attach only to violations of Title IX—yet it bears repeating because at times our cases have employed language clouding this basic principle.

The confusion is understandable. The line between actionable actual knowledge of past or ongoing misconduct and non-actionable appreciation of a risk of future misconduct can get very blurry in cases like this. At one level, the line is easy to conceptualize, as the actual knowledge inquiry, by its terms, asks whether a responsible decisionmaker had notice of an act of completed discrimination on the basis of a student's sex. See *id.* at 288–90. And we know from the Supreme

Court's 1999 decision in *Davis v. Monroe County Board of Education* what qualifies as actionable misconduct. The Court told us that the misconduct in question must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." 526 U.S. at 650.

But fact patterns in Title IX cases like this one—involving allegations of teacher-on-student sexual misconduct—often reveal escalating wrongdoing, and that is where the challenging realities of risk enter the picture. Take, for example, a teacher who becomes infatuated with a student and repeatedly texts the student in a clear, persistent, and intensifying effort to turn the relationship sexual. Everyone reading that sentence gets the picture. In our view, a school principal learning those facts may well have learned of sex discrimination within the meaning of *Davis* and, by extension, Title IX. Depending on the totality of the circumstances, a case like that could very well warrant a trial.

But recognize what the same texting hypothetical also illustrates: risk. Past misconduct may foreshadow even worse future misconduct. It takes no imagination to see this in the texting scenario or any number of like examples—a teacher persistently meeting a student off school property outside of school hours, a teacher inappropriately and repeatedly touching a student, and on and on. Certain facts, if severe and pervasive enough, can at once both satisfy *Davis*'s definition of misconduct *and* reveal risk of further and more grievous harm.

The important point for purposes of *Gebser*'s actual knowledge requirement is the first one: only once the misconduct line has actually been crossed does Title IX impose an

affirmative obligation on school districts to act—both to remedy the existing misconduct and to prevent the further foreseeable risks from materializing.

*Gebser*'s second prong supplies the test for measuring the adequacy of the school district's response. The response must not reflect "deliberate indifference to discrimination." *Gebser*, 524 U.S. at 290. As we read *Gebser* and *Davis*, it is only at this second step of the analysis that the concept of risk properly comes into play, for a school district must respond with measures to both "end the harassment" of which it has knowledge and "to limit further harassment." *Id.* at 289. Right to it, prong two of *Gebser*'s framework and the obligation to act it imposes necessarily operate to mitigate risk, including risks of escalation. Risk qua risk, in short, is not actionable, but past misconduct revealing risks of further discrimination requires the school district to respond accordingly.

The response does not have to be perfect or even successful. See, *e.g.*, *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 359 (5th Cir. 2020) (concluding that "liability does not attach where the official with authority to take corrective action responds reasonably to a risk of harm, even if the harm ultimately was not averted") (cleaned up). Owing to Title IX's roots in the Spending Clause, a school district's response will suffice to avoid institutional liability so long as it is not so unreasonable, under all the circumstances, as to constitute an "official decision" to permit discrimination. *Gebser*, 524 U.S. at 290.

Our cases have not always described the line between misconduct and risk in this way. In *Delgado v. Stegall*, our first case to apply the *Gebser* standard, we correctly explained that a Title IX plaintiff must prove that the school district had "actual

knowledge of misconduct, not just actual knowledge of *the risk of misconduct*." 367 F.3d 668, 672 (7th Cir. 2004) (emphasis added). But in the ensuing paragraphs we undermined the clarity of that rule, suggesting that liability might attach where the school has knowledge of "risks [of harassment] so great that they are almost certain to materialize if nothing is done." *Id.* We may have injected similar uncertainty a few years later in *Hansen v. Board of Trustees of Hamilton Southeastern School Corp.*, by initially rendering *Gebser*'s first prong as a requirement of "*known* acts of discrimination or harassment" before later phrasing it (without additional elaboration) as one of "actual knowledge of misconduct by [the teacher] that created a serious risk to [the school's] students." 551 F.3d 599, 605–06 (7th Cir. 2008); see also *Doe v. St. Francis Sch. Dist.*, 694 F.3d 869, 871 (7th Cir. 2012) (employing similar language).

A closer look at what we said in *Delgado* makes the point. Nicole Delgado sued her university after a professor made romantic advances toward her. See *Delgado*, 367 F.3d at 670. We held that there could be no liability because Delgado had not reported the misconduct to anyone in the administration with power to stop the discrimination. See *id.* at 672. In the language of *Gebser*, Delgado failed to show that the school had actual knowledge of the professor's sexual harassment. See *id.* That holding is unassailable.

Had we stopped there, we might not be here. But we went further, hypothesizing a case in which the professor "had been known [by the school] to be a serial harasser." *Id.* In those circumstances, we said, the school "might well be found to have had a sufficient approximation to actual knowledge that [the student] *would be harassed* to satisfy the Supreme Court's [*Gebser*] standard." *Id.* (emphasis added).

The bottom-line conclusion from this hypothetical is surely correct: a school that knowingly employs a serial harasser is asking for trouble. But the language we used in *Delgado*—the risk-related language—suggested Title IX institutional liability could arise from deliberate indifference to a risk of future misconduct without any indication of past or present harassment.

*Gebser* does not permit the imposition of liability based on risk alone, a reality *Delgado* itself earlier recognized. See *id.* at 672 (explaining that, under *Gebser*, a school must have "actual knowledge of misconduct, not just actual knowledge of the risk of misconduct"). With the benefit of hindsight, the mistake we made in *Delgado* was blurring the line between *Gebser*'s two discrete requirements—actual knowledge and deliberate indifference.

In the *Delgado* hypothetical, *Gebser*'s actual knowledge requirement is satisfied by the school's notice of its professor's history of harassment, provided that history is sufficiently recent to indicate the continued presence of "discrimination in the recipient's programs." *Gebser*, 524 U.S. at 290; see also *Doe v. Sch. Bd. of Broward County*, 604 F.3d 1248, 1257 (10th Cir. 2010) (explaining that "no circuit has interpreted *Gebser*'s actual notice requirement so as to require notice of the prior harassment of the Title IX plaintiff *herself*"). What that observation illustrates is that actual knowledge (or actual notice) sufficient to satisfy *Gebser* can arise not only from what a school administrator sees with her own eyes, but also from information she learns from others. See *Doe v. Galster*, 768 F.3d 611, 614 (7th Cir. 2014) (explaining that "[t]o have actual knowledge of an incident, school officials must have witnessed it or received a report of it").

With actual knowledge established, liability in the *Delgado* hypothetical will turn on *Gebser* prong two: whether the school's actions in response to that knowledge "amount to deliberate indifference to discrimination." *Gebser*, 524 U.S. at 291. Put another way, the likelihood that the plaintiff "would be harassed," *Delgado*, 367 F.3d at 672, is relevant not to the school's actual knowledge of past or ongoing harassment, but rather to Title IX's prong two inquiry—whether the school's response to that harassment reflected an official decision not "to take action to end the harassment or to limit further harassment." *Gebser*, 524 U.S. at 289.

In many ways, the extreme example of a school that hires a teacher with a known and ongoing history of sexually harassing students is unhelpful. There would be no way on such facts to disavow knowledge of the teacher's past misconduct that, by any measure, put the writing on the wall for more of the same. The obvious need to impose liability in such a case, however, has muddied a doctrinal distinction warranting clarification. Liability in the *Delgado* hypothetical attaches not because the school has knowledge of some great risk of *future* discrimination, but rather because it knows of *past* discrimination in its programs and has proven itself unwilling to act to put an end to it.

But we need to move out of the extreme to the more realistic and less clear-cut—to the fact patterns where allegations do not so clearly show misconduct and thus next steps are not as evident. Go back to the texting hypothetical. Imagine, however, that instead of a flurry of escalating texts, there are only three that are disconcerting, revealing of risk, but not themselves clearly indicative of ongoing misconduct. In such a circumstance, Title IX does not impose an obligation to act.

Suppose the facts are a shade or two darker, though—a few more texts with more concerning language and clear indications that a teacher has severely stepped over the line. On such facts, a reasonable jury may be able to conclude that the school district was obligated to take action because it possessed knowledge that a form of sex discrimination—the teacher's pervasive and escalating texting of the student—has already occurred. Ask any parent whether they disagree.

What all of this means as a legal matter is that a school district's duty to act is not triggered until it has actual knowledge of facts which, in the totality of the circumstances, indicate that sex-based discrimination has occurred or is occurring under its watch. See *id.* at 290. But the complexities of life do not always offer clear conclusions. Reality often manifests in shades of gray. On the legal side, the litigation process (discovery and summary judgment, in particular) will allow everything to get sorted out after the fact. But as a practical matter—when school officials have to make decisions in real time—the best course will be to err on the side of taking reactive and preventative measures to ensure compliance with Title IX.

One final point warrants underscoring. There may be cases where the relevant school official insists he had no knowledge of the alleged discrimination, and thus no duty to respond to it. And that may be so even where the objective facts allow a different finding by a jury—in particular, that the school official buried his head in the sand to avoid acquiring knowledge of past or ongoing misconduct. In such cases a Title IX plaintiff may ask for a so-called "ostrich instruction"—a directive that the jury may infer actual knowledge based on the official's willful blindness to the

objective reality in front of him. See *United States v. Ramsey*, 785 F.2d 184, 189 (7th Cir. 1986) (approving, in a criminal fraud prosecution, the following jury instruction: "No person can intentionally avoid knowledge by closing his or her eyes to facts which should prompt him or her to investigate").

While the ostrich instruction is sometimes also talked about in terms of risk, see *Ramsey*, 785 F.2d at 189, it is important to reiterate that even in ostrich cases, Title IX does not permit liability solely on the basis of knowledge of a risk of future misconduct. Instead, the instruction recognizes only that an administrator presented with facts clearly showing existing misconduct may not shirk his Title IX obligations by declining to do the math. See, *e.g.*, *Doe v. Fairfax County Sch. Bd.*, 1 F.4th 257, 269–70 (4th Cir. 2021) (emphasizing that Title IX's actual notice standard is objective, not subjective).

**II**

With that legal framework established, we turn to the facts before us.

**A**

From 2013 to 2014, plaintiff C.S. was a student at Whitehorse Middle School in Madison, Wisconsin. The Madison Metropolitan School District, of which Whitehorse is a part, is the defendant in this case. C.S. alleges that, throughout her eighth-grade year, a school security assistant named Willie Collins repeatedly sexually abused her. The details of Collins's alleged misconduct are horrific: C.S. asserts that he made sexual comments to her, kissed her, fondled her breasts, and digitally penetrated her—usually in his office at the school. There is no evidence that anyone witnessed the misconduct, and C.S. did not report the abuse

to anyone until August 2014, by which point she had left Whitehorse to attend high school. The school district placed Collins on administrative leave pending the results of a criminal investigation, and C.S. sued the district for damages under Title IX.

If eighth grade were the whole story, it is clear that Collins's alleged abuse, even if proven, could not give rise to liability for the school district. The relevant Whitehorse official "with authority to take corrective action to end the discrimination" for purposes of *Gebser* was Principal Deborah Ptak. 524 U.S. at 290. And the parties agree that Principal Ptak had no knowledge—actual or otherwise—of Collins's abuse of C.S. during eighth grade. The claim would fail at prong one of *Gebser*.

But eighth grade is not the whole story, C.S. contends, because of what happened during her seventh-grade year. Collins's duties as security assistant meant he was in regular contact with students—supervising lunch and recess, monitoring students in detention, and otherwise ensuring student safety. Whether part of his stated job description or not, Collins also served as a mentor and confidant to students, who sought him out for advice and companionship.

The alleged facts contain warning signs that Collins may have taken this role too far. He regularly gave students—boys and girls alike—hugs, often apparently initiated by the students themselves. Tracy Warnecke, the school's positive behavior support coach, testified that she saw Collins giving back or shoulder rubs to students—again, boys and girls alike—at lunch time "three to four times a week." But Warnecke also observed troubling interactions between Collins and C.S. She frequently saw C.S. asking Collins for hugs

and spending time "in his office after school," and on one occasion saw C.S. attempt to kiss him on the cheek, though he rebuffed her efforts. According to Warnecke, C.S. then tried to kiss him again, but "he stopped it and then took her for a private conversation because we were in the hallway."

Warnecke reported these incidents to Principal Ptak. Two other school employees—Karen Wydeven and Mary McAuliffe—likewise approached Ptak with concerns that C.S. and some of her female friends were frequently hugging Collins. McAuliffe, a school counselor, expressed further concerns about Collins's relationship with C.S., telling Ptak that she saw C.S. "running to [Collins] frequently, jumping on him, hanging—attempting to hang on his arm trying to hug him," and that "at one point during one of these interactions [C.S.] had attempted to kiss his cheek and that she was concerned about [C.S.]." McAuliffe also shared with Ptak that a teacher, Brooke Gritt, had similar concerns about C.S. and Collins's relationship. For Principal Ptak's part, on a few occasions she observed Collins "walk up behind [C.S.], take both of his hands and just rub the top of her shoulders." Ptak decided that she needed to take action.

On April 13, 2013, toward the end of C.S.'s seventh-grade year, Principal Ptak spoke to Collins. She told Collins to "limit" the "hugs and physical contact" with C.S., avoid interacting with her in private settings, and set "strong boundaries" in his relationship with her.

After that conversation, Ptak recalled noticing a "significant decrease" in contact between Collins and C.S. Indeed, for the rest of C.S.'s seventh-grade year and the entirety of her eighth-grade year, Ptak neither observed nor received reports of further concerns about C.S.'s relationship with Collins.

C.S. says this silence masked an awful reality—that far from ending his relationship with her, Collins allegedly sexually abused her for an entire school year behind closed doors. C.S. now seeks to hold the school district liable for Collins's conduct during eighth grade based on Principal Ptak's knowledge of their relationship in seventh grade—a relationship which C.S. says reflected a pattern of grooming behavior on Collins's part.

B

The district court entered summary judgment for the school district, determining that no reasonable jury could find that the seventh-grade conduct of which Principal Ptak had actual knowledge amounted to sexual harassment or discrimination within the meaning of Title IX. In reaching this conclusion, the district court was rightly careful not to ascribe any significance to the fact that much of the contact in this case was initiated by C.S. herself. "Schools are charged with acting *in loco parentis*," and the onus is on school employees to reject the advances of minor students, who are both legally and mentally incapable of consenting to sexual contact. *Mary M. v. N. Lawrence Cmty. Sch. Corp.*, 131 F.3d 1220, 1226–27 (7th Cir. 1997). There is no shade of gray on this point: in Title IX cases, claims by an alleged harasser that his minor victim initiated or invited the challenged conduct are of no legal consequence whatsoever. See *id.* at 1227. The controlling question is only whether the conduct Principal Ptak knew about—regardless of who initiated it—amounted to discrimination on the basis of sex giving rise to an obligation to take further action.

No doubt the facts as Principal Ptak knew them were cause for some concern. But we need not decide whether,

added together, Collins's conduct during C.S.'s seventh-grade year—as witnessed by Principal Ptak and reported to her—amounted to actionable ongoing misconduct, meaning sex discrimination that denied C.S. "equal access to [the school's] resources and opportunities." *Davis*, 526 U.S. at 651. This is so because, regardless of whether the circumstances reflected ongoing discrimination, Principal Ptak—to her credit—clearly saw the situation as requiring immediate action. That common-sense foresight led her to confront Collins in April 2013, telling him to limit his physical contact with C.S., avoid interacting with her in private settings, and set "strong boundaries" in their relationship.

The record is clear that this response was not so unreasonable as to amount to "deliberate indifference to discrimination" under *Gebser* prong two. 524 U.S. at 290. Once a school district has actual knowledge of discrimination, Title IX requires it "to take action to end the harassment or to limit further harassment." *Id.* at 289. Principal Ptak's discussion with Collins satisfied any such obligation, and the record shows she reasonably believed she had succeeded in minimizing his physical contact with C.S., since she received no further reports raising new concerns.

Principal Ptak's response, moreover, was properly calibrated to the risks inherent in Collins's conduct. If C.S.'s relationship with Collins in seventh grade was problematic, it was because of how infatuated she seems to have become with him. The fear in such a situation is that Collins would eventually take advantage of that infatuation to escalate his relationship with C.S. But there is little in the record to indicate that Collins was likely to do so. All told, even assuming that Ptak had actual notice of misconduct in seventh grade, we cannot

say that the risk of escalation was so apparent that her response to that knowledge—telling Collins to impose strong boundaries in his interactions with C.S.—was insufficient. Even if Collins eventually disregarded Ptak's commands, and we can assume for purposes of summary judgment that he did, it does not mean that Ptak or the School District made anything close to "an official decision … not to remedy the violation." *Id.* at 290.

That conclusion holds even though Principal Ptak received some additional reports about Collins's relationship with C.S. in the weeks after their discussion—that C.S. had set the password on her phone to Collins's name and had sometimes asked permission to leave classes to see Collins. Simply put, these additional facts were consistent with the reports Ptak had already received pointing toward C.S.'s infatuation with Collins. Neither report added anything new that would indicate that Collins was not going to heed Ptak's earlier warning, and so neither report created any obligation for Ptak to take further action. Nor did Ptak ever learn that Collins was disregarding her directive to set and maintain strong boundaries with C.S.

It is worth restating these observations in more legal terms. There is no doubt that Collins's conduct during C.S.'s seventh-grade year gave rise to some probability that things could get a lot worse. According to C.S., that risk materialized during her eighth-grade year in the form of sexual abuse. But the required response under *Gebser* prong two already accounted for that risk of escalation. Upon receiving actual notice of discrimination, a school district will avoid a finding of deliberate indifference so long as it takes actions reasonably calculated, based on everything it knew at the time, "to bring

[it] into compliance" with Title IX's prohibition on sex discrimination. *Id.*

Principal Ptak did so here. On the facts before us, no reasonable jury could conclude that the Madison Metropolitan School District was "aware that it was administering [its] program in violation of the condition" inherent in Title IX—its promise to the federal government not to "use [federal] funds in a discriminatory manner." *Id.* at 287, 292 (cleaned up). Under *Gebser*, that conclusion precludes a finding of institutional liability.

*        *        *

The law in this area is hard and messy, no doubt reflective of the immense challenges school administrators face when confronted with the alleged sexual abuse of a student. The Supreme Court in *Gebser* and *Davis* sketched a framework for Title IX institutional liability in these cases. It is up to district and circuit courts to apply that framework along clear and workable lines, ever mindful of the delicate educational settings in which facts unfold. We hope this opinion contributes to that effort.

With these observations, we AFFIRM.

EASTERBROOK, *Circuit Judge*, with whom KANNE, HAMILTON, and BRENNAN, *Circuit Judges*, join, concurring. I agree with my colleagues that Principal Ptak neither knew of any misconduct by Collins nor was deliberately indifferent to the implications of what she did know. Any potential for liability under Title IX of the Education Amendments of 1972 therefore is foreclosed by the approach to that statute announced in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998). But I do not join the majority opinion, because I would stop with that observation.

My colleagues go further, supplying an exegesis that they say is appropriate "to provide more concrete guidance to those tasked with complying with Title IX in the challenging setting of today's schools." Opinion at 2. School districts doubtless benefit from guidance, but supplying it is the job of officials in the Department of Education with the power to issue regulations. Our job is to decide the case at hand.

If all of the advice provided in today's opinion were noncontroversial, there would be little reason for concern. So, for example, it is wise to disapprove those of our prior opinions that merge or blur *Gebser*'s independent inquiries: knowledge of the teacher's misconduct and deliberate indifference to it. The Supreme Court has said that these are distinct; the Department of Education agrees, 34 C.F.R. §106.44(a); declarations by some panels that they are just different aspects of a single inquiry cannot stand. But the majority proceeds into more doubtful territory.

Take, for example, the conclusion (opinion at 10–11) that three risqué text messages do not suffice for liability, while four or five may do so. Maybe a regulation could say this, but a judicial opinion? (Our case does not involve any text

messages, and the litigants have been silent about their proper treatment.)

My principal concern is the assertion at page 2, repeated (with variations) later in the opinion, that liability is possible only if the responsible official knows "that misconduct rising to the level of sex discrimination has occurred. Only then does Title IX impose an obligation to act." That is not what *Gebser* says. The Justices wrote that liability is possible when the responsible official "has actual notice of, and is deliberately indifferent to, [a] teacher's misconduct." 524 U.S. at 277. My colleagues take the unmodified word "misconduct" and turn it into "misconduct rising to the level of sex discrimination". I think that we should leave *Gebser* without the amendment.

Title IX entitles boys and girls to equal educational opportunities. That rule can be violated without sexual misconduct. True, a school's failure to act against sexual misconduct by the faculty is one way in which the statute can be violated, but it isn't the only way. Think of all the attention paid to college sports under Title IX. Misconduct that causes psychological injury can violate the statute even though the wrongdoer never touches the victim. We should not give Title IX an unduly narrow focus on sexual transgressions. We know from *Davis v. Monroe County Board of Education*, 526 U.S. 629, 642–43 (1999), that knowledge of a completed sexual offense is a *sufficient* ground of liability, but *Davis* did not hold that it is a *necessary* one.

When liability rests on sexual misconduct (for example, what happened to C.S. in eighth grade), then sexual misconduct surely must be established by evidence. But there can be knowledge of misconduct without that misconduct having become sexual or discriminatory. Suppose Ptak had

learned that Collins and C.S. had gone on a date at a local movie theater. That would be egregious misconduct by Collins and convey knowledge of a substantial risk that Collins could take advantage of C.S. in a sexual way, even if nothing sexual happened on the date. Or add to the date a statement by C.S. to her mother (relayed to Ptak) that she was in love with Collins. What if the school's counselors had told Ptak that they perceived "grooming" in the actual events of seventh grade? It is easy to imagine variations that could add up to knowledge of misconduct even though Collins had yet to fondle C.S.—especially when knowledge is established by the ostrich inference, which the Supreme Court has repeatedly approved. See, e.g., *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273–74 (2013); *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011); *Leary v. United States*, 395 U.S. 6, 46 n.93 (1969).

The majority's declaration that "misconduct rising to the level of sex discrimination" must precede, and be the subject of, notice to the responsible official, has the support of at least one other circuit. See *Baynard v. Malone*, 268 F.3d 228, 237–38 (4th Cir. 2001), though a later case tempered *Baynard*'s language. *Doe v. Fairfax County School Board*, 1 F.4th 257, 266 (4th Cir. 2021). In the Eleventh Circuit, by contrast, "lesser harassment may still provide actual notice of sexually violent conduct, for it is the risk of such conduct that the Title IX recipient has the duty to deter." *Doe v. Broward County School Board*, 604 F.3d 1248, 1258–59 (11th Cir. 2010). Other circuits seem to make assumptions without directly confronting the issue. This divergence of opinion suggests the wisdom of waiting until a case presents the subject and the parties have briefed it.