DECISION
Before this Court are two appeals from a June 27, 2008 decision of the Director of Labor and Training, granting in part and denying in part Joyce Cardono's (hereinafter "Ms. Cardono") claim against her former employer, Geret Dubois, M.D., Inc. (hereinafter "Dr. Dubois") for unpaid wages. As these appeals involve the same administrative decision and implicate the same statutory and regulatory provisions, this Court, in order to promote clarity and judicial economy, consolidated these appeals for review and disposition. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 I Facts and Travel
On January 31, 2007, Ms. Cardono filed a claim with the Rhode Island Department of Labor and Training's (hereinafter "Department") Labor Standards Division alleging, inter alia, that she was a former employee of Dr. Dubois' medical *Page 2 
practice and was entitled to unpaid wages for overtime and vacation that had accrued between June of 1995 and January of 2007. On December 12, 2007 and March 25, 2008, Mary Ellen McQueeney-Lally (hereinafter "Hearing Officer"), acting as the duly authorized representative of the Director of Labor and Training, held hearings on Ms. Cardono's claim of unpaid wages against Dr. Dubois.
At the December 12th hearing, Ms. Cardono testified that she first began working for Dr. Dubois in the spring of 1995 and was performing general "office work." (Tr. 12/12/07 at 11.) When asked to describe her particular job functions, Ms. Cardono testified that Dr. Dubois' medical practice group was in the process of "splitting up" and that the members of the practice "needed to have their paperwork in order and a list of [which] [patient medical files] they were destroying." Id. Once Ms. Cardono began working exclusively for Dr. Dubois in June of 1996, she indicated that she "was doing dictation, doing prescriptions, doing the intake/outtake desk, balancing the money . . ., checking patients in and out." (Tr. 12/12/07 at 12.)
After approximately one year performing the aforementioned duties, Dr. Dubois "realized that the people [he] had doing the [medical] billing were billing wrong." Id. At this time, Ms. Cardono received certification as a "medical billing specialist" and asked Dr. Dubois to perform medical billing for his practice; according to Ms. Cardono, she started working for Dr. Dubois in this capacity.Id. Ms. Cardono described her duties as a medical billing specialist as follows:
 [W]hen I began [working for Dr. Dubois as a medical billing specialist], I went back and negotiated a great deal of money that was being lost to people at BlueCross and United Health because it was billed improperly. . . . I managed to regain most of that money, which was a huge *Page 3 
amount of money. . . . I [also] coded and billed. (Tr. 12/12/07 at 19.)
When asked by counsel to describe when she first learned of Dr. Dubois' vacation policy, Ms. Cardono testified that "[a] year into [her employment with Dr. Dubois] . . . [she] had asked to have the week of the Fourth of July off." (Tr. 12/12/07 at 13.) At this time, the office manager of Dr. Dubois' practice, Lorraine Vadnais (hereinafter "Ms. Vadnais"), informed Ms. Cardono that she "[had] two weeks coming" and that her vacation time "[would] just accumulate" if un-used. Id. Ms. Cardono further testified that if she didn't take her two weeks of vacation time, that time would be "rolled over" into the following year. (Tr. at 12/12/07 at 14.)
On the issue of Ms. Cardono's accrued vacation time, counsel asked Ms. Cardono whether she had received payment for any of the vacation time that she had accrued and, if so, when that payment had been made. (Tr. 12/12/07 at 19-20.) Ms. Cardono responded that in July of 2006, she received "an extra paycheck as a vacation check" when she decided to forgo her vacation. (Tr. 12/12/07 at 20.) This was, according to Ms. Cardono's hearing testimony, the only occasion on which she received compensation for her vacation time. (Tr. 12/12/07 at 21.) While Ms. Cardono acknowledged that she took approximately five weeks of vacation time during the last month of her employment with Dr. Dubois, she was adamant that she did not receive compensation for this or any other accrued vacation time.Id. However, Ms. Cardono later acknowledged that she received "a three-week vacation check around [December] 29, 2006. . . ."[1]
(Tr. 12/12/07 at 26, 28.) *Page 4 
When counsel probed as to whether Dr. Dubois had promulgated a written policy regarding vacation time, Ms. Cardono answered in the negative. (Tr. 12/12/07 at 13.) According to Ms. Cardono, she had been advised of the relevant details of Dr. Dubois' vacation policy by Ms. Vadnais. (Tr. 12/12/07 at 13.) Ms. Cardono made clear that "Dr. Dubois [was] off-limits to all employees" and that all inquiries regarding the practice's vacation policy "[had] to go through [Ms. Vadnais]." (Tr. 12/12/07 at 22.) According to Ms. Cardono's hearing testimony, she never discussed the applicable vacation policy with Dr. Dubois. Id.
Ms. Cardono continued her hearing testimony by explaining Dr. Dubois' overtime policy. As Ms. Cardono explained, she "was doing a sixty-hour a week job for a thirty-seven-and-a-half hour week's pay. And when [Dr. Dubois] retired or if [she] became ill or anything happened, then that time would accumulate into making certain that [Ms. Cardono] had a paycheck every week for whatever time [she] had coming in." (Tr. 12/12/07 at 15.) Ms. Cardono indicated that she maintained records of her overtime when she began working solely for Dr. Dubois. (Tr. 12/12/07 at 16.) Ms. Cardono answered in the negative when asked by counsel whether she had received compensation for her accrued overtime, but added that she did not inquire about overtime because it was her "interpretation and understanding . . . that it was all rolling over and . . . would be squared up at the very end" of her employment. (Tr. 12/12/07 at 20, 22-23.)
At some point in 2006, Ms. Cardono began taking one day off per week for approximately "three-quarters of the year. . . ." (Tr. 12/12/07 at 17.) However, Ms. Cardono had an "agreement" with Dr. Dubois that she could have the time off, provided *Page 5 
that she made up the hours. Id. According to Ms. Cardono, Dr. Dubois' practice was open for business between the hours of 8:30 a.m. and 4:30 p.m. on Monday through Thursday and between 8:30 a.m. and 2:00 p.m. on Friday. (Tr. 12/12/07 at 18.) When the office closed, Ms. Cardono would stay to make up any time that she was away from the office. Id. In order to make up for the time that she had missed during the workweek, Ms. Cardono stated that she "worked Saturdays, and came in at 7:00 a.m., 7:30 a.m. . . . [She] never took lunch. [She] never took breaks. . . . [She] had no reason to leave [her] chair." (Tr. 12/12/07 at 61.)
Ms. Cardono further testified that she began receiving pay stubs for her work at some point in 2006; prior to 2006, she received a "net check" that stated her weekly earnings. (Tr. 12/12/07 at 24.) The "net checks" that Ms. Cardono received prior to 2006 did not, according to Ms. Cardono's hearing testimony, set forth the amount of vacation and/or overtime that she had accrued during the workweek. (Tr. 12/12/07 at 25.) Likewise, the pay stubs that she began receiving in 2006 failed to note the amount of vacation and/or overtime accrued by Ms. Cardono. (Tr. 12/12/07 at 26.)
With respect to Ms. Cardono's employment status, counsel for Ms. Cardono asked her whether she considered herself a salaried employee during her employment with Dr. Dubois; Ms. Cardono responded negatively, indicating that she was paid on a thirty-seven-and-a-half hour workweek. (Tr. 12/12/07 at 31.)
On cross-examination by counsel for Dr. Dubois, Ms. Cardono testified that her position as a "medical billing specialist" required her to determine, based on Dr. Dubois' patient notes, the various services that had been rendered by Dr. Dubois as well as the insurance billing codes for those services. (Tr. at 12/12/07 at 37.) In addition to these *Page 6 
tasks, Ms. Cardono discovered that Dr. Dubois' prior medical billing specialist had made "enormous mistakes" with respect to the preparation and coding of insurance documentation and "didn't know how to bill." (Tr. 12/12/07 at 40-41.) Thus, Ms. Cardono "spoke [with] and befriended [the insurance companies] . . . to get [the] money for [Dr. Dubois]." (Tr. 12/12/07 at 40.) While Ms. Cardono could not testify as to the precise amount that she recovered for the improperly submitted insurance claims, she indicated that the amount was "large." (Tr. 12/12/07 at 41.)
In addition to recovering sums of money for improperly submitted claims, Ms. Cardono was "authorized by [Ms. Vadnais]" to correct omissions and errors in Dr. Dubois' insurance codes in order to accurately reflect the services rendered by Dr. Dubois. (Tr. 12/12/07 at 53.) Ms. Cardono added that "she was totally authorized always" to correct Dr. Dubois' coding mistakes and that his practice "depended on [her]." (Tr. 12/12/07 at 53-54.)
Counsel for Dr. Dubois then presented Ms. Cardono with a copy of the complaint that she filed with the Labor Standards Division and focused her attention on language contained therein that stated, "I [Ms. Cardono] was always told that I was at management level. . . ." (Tr. 12/12/07 at 64-65.) While Ms. Cardono indicated that she had "always [been] told that [she] was at a different level" than that of management, she admitted that her handwriting appeared on the complaint. (Tr. 12/12/07 at 65.) Ms. Cardono explained this apparent discrepancy by testifying that she "was at a different level" than "[t]he other girls in the front or x-ray technicians."Id. She added that she "was always told that [she] was at the same level, not the pay level, but the same level as [Ms. Vadnais][,]" the office manager. Id. *Page 7 
Focusing on language contained elsewhere in the complaint, counsel for Dr. Dubois asked Ms. Cardono whether she had accrued twenty hours of overtime per week from 1997 to 2000; Ms. Cardono answered in the affirmative, indicating that this overtime was accrued "collecting and correct[ing] billing errors made by non-competent help." (Tr. 12/12/07 at 67.) When asked by counsel for Dr. Dubois why she had not asserted a claim for unpaid overtime for the period between 2004 and 2006, Ms. Cardono responded that "[Ms. Vadnais] told [her] to keep track of [her overtime], and it [would] be handled in the end [of the practice]." (Tr. 12/12/07 at 67-68.)
As to the circumstances surrounding Ms. Cardono's separation from Dr. Dubois' medical practice, counsel for Dr. Dubois inquired as to whether criminal charges had been filed against Ms. Cardono that "related to activity done in the course of [her] employment at Dr. Dubois' office." (Tr. 12/12/07 at 73.) Ms. Cardono responded that "fraud" charges had been brought against her because she "called in prescriptions for someone without Dr. Dubois' permission."[2] (Tr. 12/12/07 at 74.) Although she could not recall the number of times she had "called in prescriptions" without Dr. Dubois' authorization, Ms. Cardono estimated that she had done so "probably over 100 times." (Tr. 12/12/07 at 75.) On questioning by counsel for Dr. Dubois, Ms. Cardono admitted that the period of time during which she was calling in prescriptions illegally overlapped with the period of time for which she was now claiming unpaid overtime pay. (Tr. 12/12/07 at 78, 80-81.) *Page 8 
Following Ms. Cardono's hearing testimony, the Hearing Officer adjourned the hearing. When the hearing on Ms. Cardono's complaint reconvened on March 25, 2008, the Hearing Officer advised the parties that "[a] recent [Rhode Island] Supreme Court case ha[d] come down since our last hearing indicating that documents that have been submitted to departments are not introduced at a hearing. . . ."[3] (Tr. 3/25/08 at 5.) As Ms. Cardono's calendars — calendars alleging illustrating the amount of vacation and overtime that she accrued during her employment with Dr. Dubois' medical practice — had been submitted to the Department in connection with its investigation of Ms. Cardono's complaint but had not been introduced as evidence during the December 12, 2007 hearing, the Hearing Officer indicated that she wanted "to give [counsel for Ms. Cardono] the opportunity to submit . . . introduce the [calendar] evidence. . . ." (Tr. 3/25/08 at 6.) After describing the calendars as "copy pages out of calendars kept by Ms. Cardono of the hours that she worked on a day-to-day basis," counsel for Ms. Cardono introduced the calendars into evidence. See Complainant's Ex. 3.
Promptly objecting to the admission of Ms. Cardono's calendars, counsel for Dr. Dubois argued that "these documents . . . don't meet the rules of evidence in terms of what is admissible [because] [t]hey are, in fact, compilations of other documents that have not been produced." (Tr. 3/25/08 at 26.) In response to counsel's objection, the *Page 9 
Hearing Officer conducted a brief direct examination of Ms. Cardono in order to ascertain how the calendars had been prepared and whether they had been prepared contemporaneously. Id. Ms. Cardono testified that she would record her hours on a sheet of paper and maintained a "daily tab." (Tr. 3/25/08 at 28.) Upon completing her "daily tab," Ms. Cardono would attach the sheet of paper to her calendar and would transfer the information to her calendar "[w]hen [she] had the time." (Tr. 3/25/08 at 27-28.) As Ms. Cardono explained, the sheets of paper with her hours "would be left under [her] [computer] keyboard for a week or two weeks at a time. Then [she] would just clip [the papers] into [her] book and, when [she] had the time, [she] would transfer [the information] to the [calendar] book." (Tr. 3/25/08 at 28.) Ms. Cardono then copied her calendars upon filing her complaint with the Department. (Tr. 3/25/08 at 29.) The Hearing Officer, satisfied that Ms. Cardono's calendars "were made in appropriate time" and that they "had documentation that she put on it," allowed the calendars to be admitted into evidence. (Tr. 3/25/08 at 30-31.)
The Hearing Officer next heard testimony from Dr. Dubois' office manager, Ms. Vadnais. Ms. Vadnais testified that Ms. Cardono began her employment with Dr. Dubois' practice "as [Ms. Vadnais'] transcription person and then went into billing." (Tr. 3/25/08 at 33.) In her role as a "medical billing specialist," Ms. Cardono "billed every office visit, any x-rays, . . . did follow-ups, sent out the billing, did secondary billing."Id.
When asked by counsel for Dr. Dubois whether Ms. Cardono was under Ms. Vadnais' or Dr. Dubois' control with regard to the method and means by which she performed her medical billing functions, Ms. Vadnais responded that "[Ms. Cardono] was *Page 10 
pretty much on her own. . . . If she had any questions, she would come to me." (Tr. 3/25/08 at 34.) However, Ms. Vadnais added that Ms. Cardono was knowledgeable as to the insurance coding procedures and, "in some areas," more knowledgeable than Ms. Vadnais. Id. Ms. Vadnais made clear that Ms. Cardono was "that knowledgeable to be able to make decisions regarding the proper coding procedures to apply for billing purposes."Id.
Ms. Vadnais further testified that Ms. Cardono was salaried and "was paid weekly, the same amount every week." (Tr. 3/25/08 at 35.) According to Ms. Vadnais, Ms. Cardono was earning "seven-hundred and sixty-five dollars a week gross" at the time she separated from Dr. Dubois' employ and this salary "stayed at the same level . . . [s]ame amount" when the practice reduced the work week from forty hours to thirty seven and one-half hours. (Tr. 3/25/08 at 35-36.)
Counsel then focused on the issue of Ms. Cardono's claim for unpaid overtime and vacation wages. Ms. Vadnais indicated that she was not aware of any overtime worked by Ms. Cardono and did not direct Ms. Cardono to maintain a record of her overtime hours. (Tr. 3/25/08 at 36-37.) Additionally, Ms. Vadnais asserted that she never observed Ms. Cardono writing down her overtime hours. (Tr. 3/25/08 at 37.) When presented with language from Ms. Cardono's complaint to the Department that she had "worked an extra twenty hours a week [from 1997 to 2000] to correct and collect billing errors made by non-competent help," Ms. Vadnais was emphatic that "there was no overtime." (Tr. 3/25/08 at 38.)
Ms. Vadnais was then presented with a letter written by Dr. Dubois' former attorney to the Department. See
Respondent's Ex. 4. In the letter, the attorney indicated *Page 11 
that Ms. Cardono had accrued fifty-nine vacation days over the course of her employment with Dr. Dubois' practice and that she had been compensated for all fifty-nine of the vacation days that she had accrued. (Tr. 3/25/08 at 39.) Ms. Vadnais responded in the affirmative when asked whether the assertion in the letter regarding the discharge of Ms. Cardono's vacation time was accurate.Id. According to Ms. Vadnais' hearing testimony, Ms. Cardono had been paid for her accrued vacation time on the last day of her employment and that the amount owing to Ms. Cardono had been calculated by both Ms. Vadnais and Dr. Dubois. (Tr. 3/25/08 at 49.)
Counsel for Dr. Dubois then presented Ms. Vadnais with a set of documents entitled "Geret A. Dubois, M.D., Inc. — Yearly Earnings Report." See Respondent's Ex. 5. Included in the set of documents was a copy of the vacation check that had been issued to Ms. Cardono on December 29, 2006 and Ms. Vadnais' handwritten notes regarding Ms. Cardono's accrued vacation time for the period between 2004 and 2006. (Tr. 3/25/08 at 41-42.) Once she had had an opportunity to review this documentation, Ms. Vadnais testified that it supported the assertion made by Dr. Dubois' attorney to the Department that Ms. Cardono had accrued fifty-nine vacation days and had been duly compensated. (Tr. 3/25/08 at 43.)
Ms. Vadnais was also presented with a document dated March 25, 2008 that had been prepared by a certified public accountant. See Respondent's Ex. 6. Ms. Vadnais testified that this documentary evidence confirmed that on "January 19, 2005, . . . the hours were dropped from forty hours to thirty-seven and one half [hours] per employee, and Ms. Cardono's weekly pay . . . stayed the same. It was not affected." (Tr. 3/25/08 at 44.) *Page 12 
Ms. Cardono's status as a salaried employee was confirmed, according to counsel for Dr. Dubois, by information contained on a "payroll journal." (Tr. 3/25/08 at 45.) Directing her attention to Ms. Cardono's entry in the journal, Ms. Vadnais testified that there was no information in the column that read "Hours, Rate, Regular, and O.T."; rather, Ms. Cardono earned $765 at the time the journal entry had been prepared. Id. Counsel then contrasted Ms. Cardono's payroll information in the journal with that of another employee who, according to the entry in the "Hours, Rate, Regular, and O.T." column, was earning thirteen dollars per hour worked. Id. As Ms. Vadnais explained, "[T]he other people were on an hourly rate and [Ms. Cardono] was not." (Tr. 3/25/08 at 46.) Indeed, while Ms. Cardono's practice was to make up for any time that she was absent from the workplace, Ms. Vadnais indicated that her absences "did not affect [her weekly pay]." (Tr. 3/25/08 at 47.)
On cross-examination by counsel for Ms. Cardono, Ms. Vadnais reaffirmed her earlier testimony that "[t]here is no overtime" policy in effect at Dr. Dubois' medical practice. (Tr. 3/25/08 at 51-52.) While Ms. Vadnais acknowledged that she has "been known to work fifty-five, fifty hours a week, forty-five hours a week, because it's part of the territory [of] being a manager," she stressed that she is not compensated for any hours work over and above the thirty seven and one-half hours required. (Tr. 3/25/08 at 52.)
At the conclusion of Ms. Vadnais' hearing testimony, Dr. Dubois testified that he was contacted by the Rhode Island Department of Health regarding a number of prescriptions that had been phoned in by Ms. Cardono without his knowledge or consent. (Tr. 3/25/08 at 71.) In total, "[t]here were 400 different prescriptions called in of which . . . 393 were under [Dr. Dubois'] name." (Tr. 3/25/08 at 72.) When counsel for Dr. *Page 13 
Dubois moved to admit into evidence a list of the prescriptions that Ms. Cardono ordered, counsel for Ms. Cardono objected because she didn't "see how this [information] ha[d] anything to do with [Ms. Cardono's] overtime or . . . with her vacation time." (Tr. 3/25/08 at 72-73.) The Hearing Officer overruled counsel's objection, stating,
 It has everything to do with it. Some of the dates that appear on this document are the same dates for which [Ms. Cardono] is claiming overtime. So she is, in effect, claiming overtime for work performed for Dr. Dubois when she was, in fact, using some of the time at his office to call in phony prescriptions. . . . (Tr. 3/25/08 at 73.)
On July 1, 2008, the Hearing Officer issued a lengthy written decision. In the decision, the Hearing Officer rejected the contention advanced by Dr. Dubois in his post-hearing memorandum that Ms. Cardono did not qualify for unpaid wages for overtime under the Fair Labor Standards Act (hereinafter "FLSA") because she fell within the so-called "administrative employee exemption." (Hearing Officer's Dec. at 2.) While the Hearing Officer found that Ms. Cardono was "very good at her job" and "was tenacious in pursuing payment from insurance companies," her position did not "require the exercise of discretion and independent judgment with respect to matters of significance." (Hearing Officer's Dec. at 2-3.) Ms. Cardono did not exercise such discretion and independent judgment because "[Ms. Cardono] worked under [Ms. Vadnais], the office manager, who had authority over the whole office[,]" and because her work consisted "in applying techniques, procedures [and] specific standards described in manuals." (Hearing Officer's Dec. at 3.) Accordingly, the Hearing Officer was satisfied that Ms. Cardono was not an "administrative employee" within the meaning of the FLSA overtime exemption and, therefore, was entitled to pursue a claim for unpaid overtime. Id. *Page 14 
The Hearing Officer likewise rejected Dr. Dubois' argument that Ms. Cardono had failed to satisfy her burden of proving that she was entitled to unpaid wages for overtime and vacation. While Dr. Dubois renewed the objection raised at the hearing that Ms. Cardono's calendars "were offered in an untimely fashion after [Ms.] Cardono had completed her testimony," the Hearing Officer concluded that she allowed the calendars to be admitted because
 [p]rior to the [Rhode Island Supreme Court's decision in] Arnold [v. Lebel] . . ., it was unclear if materials [previously] submitted to the Labor Standards Examiner were available for the hearing officer's review. Therefore, [Ms.] Cardono was given the opportunity to submit calendar pages previously provided to the Department . . . [and] [Dr.] Dubois' counsel had an opportunity to cross-examine [Ms. Cardono] on the calendars. . . . (Hearing Officer's Dec. at 3-4.)
While Dr. Dubois maintained that "[Ms.] Cardono offered no testimony to explain her notations on the calendars or how she calculated the hours[,] the Hearing Officer was "satisfied that [Ms.] Cardono kept contemporaneous records on the hours she worked for [Dr. Dubois] . . . [and that] [t]hese records were transferred at a later date to the calendars that [Ms.] Cardono submitted into evidence." (Hearing Officer's Dec. at 5.) Indeed, the Hearing Officer concluded that the calendars were "appropriate for consideration," "speak for themselves," and were "very clear on the hours per day that [Ms.] Cardono worked and the overtime hours per week that she [was] claiming." Id. Thus, based on the "persuasive" evidence and testimony adduced at the two hearings by Ms. Cardono, the Hearing Officer concluded that Ms. Cardono was entitled to unpaid wages for seven weeks of vacation.[4]
(Hearing Officer's Dec. at 7.) *Page 15 
Next, the Hearing Officer turned to Dr. Dubois' argument that the doctrine of "unclean hands" acted as a complete bar to Ms. Cardono's recovery against him. The Hearing Officer found the doctrine applicable because
 [Ms.] Cardono [was] claiming overtime pay for days during which she made one and up to four phone calls in a criminal activity. Although it is impossible to say how much time was spent on these phone calls, . . . the doctrine of unclean hands . . . dictate[d] against [Ms.] Cardono collecting overtime pay for the period of time she was engaging in this activity." Id.
Applying the doctrine, the Hearing Officer concluded that Ms. Cardono was not entitled to overtime for the months that she made phone calls to illegally obtain prescription medications.[5]
(Hearing Officer's Dec. at 8.) However, the Hearing Officer refused to apply the doctrine of "unclean hands" when evaluating the credibility of the witnesses. Id. The Hearing Officer made clear that she "found [Ms.] Cardono quite credible in her testimony[,]" and that "[Ms.] Vadnais' testimony was less than forthcoming." Id.
Finally, the Hearing Officer rejected the argument advanced by Dr. Dubois that he did not have notice of the period of time for which Ms. Cardono was claiming unpaid wages because "the complaint filed by [Ms.] Cardono asserted that her claim for overtime wages was for the period 1997 to 2000," whereas the focus on the hearing was on "those [wages] earned between January 31, 2004 and January 31, 20007." (Hearing Officer's *Page 16 
Dec. at 9.) While the Hearing Officer recognized that there were "several inconsistencies in [Ms.] Cardono's complaint" to the Department, she was mindful that "[t]he complaint forms used by the Department . . . were never meant to be strictly construed." (Hearing Officer's Dec. at 10.) Accordingly, the Hearing Officer was satisfied that "[Ms. Cardono's failure to give detail on the overtime claim for 2004 to 2007 on the complaint form did not deprive [Dr.] Dubois of due process and should not result in dismissal of the claim." Id.
Following the Hearing Officer's decision, granting in part and denying in part Ms. Cardono's claim for unpaid wages, [6]
Dr. Dubois, aggrieved by the Hearing Officer's decision, filed a timely appeal to this Court on July 24, 2008. An amended complaint *Page 17 
was filed by Dr. Dubois on July 30, 2008. Ms. Cardono, also aggrieved by the Hearing Officer's decision, filed a timely appeal on July 25, 2008. The appeals were consolidated by an order of this Court.
 II Standard of Review
Pursuant to § 42-35-15, "[a]ny person, . . . who has exhausted all administrative remedies available to him or her within [an] agency, and who is aggrieved by a final order in a contested case is entitled to judicial review" by the Superior Court. The Court "may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
"In reviewing an agency's decision, this Court is limited to an examination of the certified record in deciding whether the agency's decision is supported by substantial evidence." Center forBehavioral Health, Rhode Island, Inc. v. Barros,710 A.2d 680, 684 (R.I. 1998). Substantial evidence has been defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance." NewportShipyard. Inc. v. Rhode Island Commission for Human Rights,673 A.2d 457, 459 (R.I. 1996). *Page 18 
"Questions of law determined by the administrative agency are not binding upon [the Superior Court] and may be freely reviewed to determine the relevant law and its applicability to the facts presented in the record." State Dep't of Environmental Mgmt.v. State Labor Relations Bd., 799 A.2d 274, 277 (R.I. 2002) (citing Carmody v. Rhode Island Conflict of InterestComm'n, 509 A.2d 453, 458 (R.I. 1986)). However, "[a]dministrative agencies retain broad enforcement discretion and, as always, considerable deference is accorded to such agencies about how to enforce regulations." Arnold v. Lebel,941 A.2d 813, 820-21 (R.I. 2007).
 III Analysis
On appeal, Dr. Dubois argues that the Hearing Officer's decision is in violation of constitutional provisions, affected by error of law, clearly erroneous in view of the reliable, probative, and substantial record evidence, and characterized by an abuse of discretion. In turn, Ms. Cardono asserts that the Hearing Officer's decision is affected by error of law and clearly erroneous in view of the reliable, probative, and substantial record evidence. The appellate arguments advanced by Dr. Dubois and Ms. Cardono will be addressed in seriatim.
Preliminarily, Dr. Dubois argues that Ms. Cardono is exempt from the overtime provisions of the FLSA because she was employed by his medical practice "in a bona fide administrative capacity." Based on the memorandum of law submitted by Ms. Cardono, she proceeds on the assumption that she is non-exempt and that her exemption status is not in dispute. Next, Dr. Dubois asserts that even if this Court determines that Ms. Cardono is non-exempt from the FLSA's overtime provisions, her claim against him for unpaid wages is completely barred by the doctrine of "unclean hands." Specifically, *Page 19 
Dr. Dubois contends that Ms. Cardono was engaged in illegal conduct while in his employ and, as such, the Hearing Officer was required to find that this ongoing criminality precludes her recovery of any unpaid wages. Conversely, Ms. Cardono maintains that the doctrine of "unclean hands" is completely inapplicable to the case at bar and that the Hearing Officer's decision to apply the doctrine to partially reduce her recovery from Dr. Dubois is affected by error of law. Additionally, Dr. Dubois asserts that the Hearing Officer's decision must be reversed because she abused her discretion in choosing to credit Ms. Cardono's hearing testimony and by basing her decision on documentary and testimonial evidence that Dr. Dubois maintains is neither reliable nor probative. In turn, Ms. Cardono maintains that there was legally competent evidence in the record that she was entitled to unpaid wages for all of the vacation time that she accrued while in Dr. Dubois' employ — including vacation time accrued prior to January 31, 2004. Finally, Dr. Dubois asserts that the Hearing Officer's decision is in violation of his due process rights. Specifically, Dr. Dubois maintains that the period of time set forth in Ms. Cardono's complaint to the Department differed significantly from the period of time that was the focus of the proceeding before the Hearing Officer.
 A Applicability of the FLSA's Administrative Exemption
As a threshold matter, the Hearing Officer was required to determine whether Ms. Cardono was eligible for unpaid wages for accrued overtime or whether she was, as Dr Dubois now asserts, an "employee employed in a bona fide administrative capacity" and, under the provisions of the FLSA, exempt from the Act's overtime provisions. See 29 U.S.C. § 213. The Hearing Officer ultimately concluded that Ms. Cardono was non-exempt and, therefore, entitled to pursue her claim against Dr. Dubois for unpaid wages. *Page 20 
In reviewing the Hearing Officer's decision, this Court will defer to the Hearing Officer's interpretation of the FLSA's "administrative exemption," as she was "interpret[ing] a statute whose administration and enforcement have been entrusted to the [Department]." Pawtucket Power Assoc. v. City of Pawtucket,622 A.2d 452, 456 (R.I. 1993)).
 1 Statutory and Regulatory Framework
The FLSA sets minimum requirements for wage and overtime payments and prohibits employment for more than a specified number of hours per week without proper overtime compensation.See 29 U.S.C. §§ 201-213. Certain employees, however, are exempt: "Minimum wage and maximum hour requirements . . . shall not apply with respect to . . . any employee employed in a bona fide . . . administrative . . . capacity.See 29 U.S.C. § 213(a)(1).
Title 29, § 541.200 of the Code of Federal Regulations (hereinafter "C.F.R.") defines an "employee employed in a bona fide administrative capacity" as any employee: (1) Compensated on a salary . . . basis at a rate of not less than $455 per week . . .; (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer . . .; and (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. An employer defending a suit under the FLSA bears the burden of establishing that a particular employee's job falls within a recognized exemption.Cash v. Cycle Craft Co., Inc.,508 F.3d 680, 683 (1st Cir. 2007) (citingReich v. John Alden Life Ins. Co.,126 F.3d 1, 7 (1st Cir. 1997)). Additionally, "the remedial nature of the statute requires that [its] exemptions be narrowly construed against the employers seeking to assert them" and "limited to those establishments plainly and *Page 21 
unmistakably within [the exemptions'] terms and spirit."Id. (quoting Arnold v. Ben Kanowsky, Inc.,361 U.S. 388, 392 (1960)).
An employee's work is "directly related to the management or general business operations" of the employer if the "employee . . . perform[s] work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201. While not exhaustive, the following functional areas include "work directly related to management or general business operations": accounting, auditing, insurance, safety and health, and legal and regulatory compliance. Id.
In determining whether an employee's primary duty includes "the exercise of discretion and independent judgment," the C.F.R. further provides that "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202. The term "matters of significance" refers to "the level of importance or consequences of the work performed." Id. The C.F.R. makes clear, however, that
 [t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources. . . . The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work. Id. *Page 22 
Further, "[a]n employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly." Id.
 2 The Hearing Officer's Determination of Ms. Cardono's Exemption Status
Based on the record before this Court, this Court is satisfied that there was reliable, probative, and substantial evidence before the Hearing Officer that the first part of the two-step "administrative exemption" analysis — the salary-basis test — clearly had been met. Neither party disputed that Ms. Cardono was earning more than $455 per week at the time of her separation from Dr. Dubois' medical practice and that she was compensated on a salary — rather than on an hourly — basis.See 29 C.F.R. § 541.200.
The nature of Ms. Cardono's day-to-day duties for the practice and her ability to exercise discretion and independent judgment, however, were very much in dispute during the hearing. In her written decision, the Hearing Officer did not address the issue of whether Ms. Cardono's "primary duty [was] the performance of office or non-manual work directly related to the management or general business operations" of Dr. Dubois' medical practice. 29 C.F.R. § 541.200. Rather, she focused primarily on whether Ms. Cardono's primary duty involved "the exercise of discretion and independent judgment . . .," ultimately concluding that such discretion and judgment was not a component of Ms. Cardono's primary duties. Id.
In his memorandum of law, Dr. Dubois posits that "Ms. Cardono's job responsibilities, by her own testimony, constituted "specialized work directly related to the management or general business operations of [his practice] and its patients" because Ms. Cardono's "skilled billing activities were central to the day-to-day business and *Page 23 
financial operations of [the practice]." Dr. Dubois focuses on the fact that "Ms. Cardono applied specialized knowledge of the interrelationships among various medical procedures and the coding for those procedures to ensure the correct processing of insurance claims" and "was responsible for the office's receiving payment pursuant to a highly developed coding system. . . ." Id.
Having reviewed the record in its entirety and the applicable regulatory provisions, this Court finds that there was legally competent evidence in the record from which the Hearing Officer could have concluded that Ms. Cardono's primary duties for Dr. Dubois as his "medical billing specialist" constituted "office or non-manual work directly related to the management or general business operations" of his medical practice. The record reflects that Ms. Cardono's routine tasks could easily fall within one or more of the functional categories enumerated in 29 C.F.R. § 541.201. For example, Ms. Cardono's primary duties as a "medical billing specialist" could properly have been considered as involving "accounting,"[7] "auditing,"[8] "insurance,"[9]
"safety and health," or "legal and regulatory compliance."[10]See 29 C.F.R. § 541.201. However, that Ms. Cardono's primary duties were directly related to the management or general business operations of Dr. Dubois' medical practice would not have ended the Hearing Officer's inquiry into Ms. Cardono's exemption status under the FLSA. *Page 24 
The Hearing Officer ultimately concluded that Ms. Cardono did not fall within the ambit of the FLSA's "administrative exemption" because her primary duties for Dr. Dubois' practice did not involve "the exercise of discretion and independent judgment with respect to matters of significance." See 29 C.F.R. § 541.200. In her decision, the Hearing Officer found that while Ms. Cardono "learned the appropriate codes, . . . learned what codes would not be accepted if used with other codes, . . . [and] made corrections if a procedure was coded incorrectly by [Dr. Dubois]," her "testimony made it clear that she did not exercise discretion and independent judgment." (Hearing Officer's Dec. at 3.) Conversely, Dr. Dubois asserts that Ms. Cardono exercised considerable discretion and independent judgment "every day" as she "negotiated remittances from insurance providers for past procedures and office visits which had been improperly coded and billed, . . . worked with insurance providers' representatives to revise mishandled claims, . . . [and] was "in constant contact" with insurance company representatives, keeping abreast of changes in billing structure. . . ." (Dr. Dubois' Mem. of Law at 14-15.) Additionally, Dr. Dubois asserts that Ms. Cardono "did not seek input from anyone in the office on how to bill insurance providers . . . [and] was authorized to devise coding combinations . . . according to her interpretation of [Dr. Dubois'] notes." Id.
Dr. Dubois presented evidence that suggested that Ms. Cardono "[had] authority to . . . implement management policies or operating practices, . . . commit [Dr. Dubois' practice] in matters that ha[d] significant financial impact, . . . negotiate and bind the company on significant matters, . . . [and] investigate matters of significance on behalf of management." This Court also recognizes that "employees can exercise discretion and *Page 25 
independent judgment even if their decisions or recommendations are reviewed at a higher level." See 29 C.F.R. § 541.202. However, the Hearing Officer had legally competent record evidence before her that what Dr. Dubois characterizes as "the exercise of discretion and independent judgment" was nothing more than the use of Ms. Cardono's medical billing skills "in applying well-established [medical billing] techniques, procedures, or specific standards described in [the] manuals or other sources" promulgated by the insurance companies.
As the Hearing Officer ultimately concluded, Ms. Cardono's primary duties for the practice as a "medical billing specialist" were more accurately viewed as "clerical or secretarial work": Ms. Cardono dutifully "record[ed] or tabulat[ed]" the appropriate insurance billing codes following a patient visit, and performed the "mechanical, repetitive, and recurrent" task of reviewing Dr. Dubois's coding for errors and submitting the claims pursuant to well-established policies and procedures. 29 C.F.R. § 541.202. Though Dr. Dubois' medical practice would undoubtedly have "experience[d] financial losses if [Ms. Cardono] failed to perform the job [of medical billing specialist] properly[,]" the C.F.R. makes clear that staving off financial disaster, without more, does not constitute an exercise of discretion or independent judgment.Id.; see Black v. Coalska, Inc., 2008 WL 4681567 (W.D.Wash.) (holding that employee who directed work crews on multi-million dollar construction contracts, performed work that affected employer's business to substantial degree, had ability to bind employer on significant matters, provided consultation and expert advice, investigated and resolved matters of significance on behalf of management did not exercise discretion and independent judgment); see also Gallegos v. EquityTitle Co. of America, Inc., 484 F.Supp.2d 589, *Page 26 
596 (W.D.Tex., 2007) (holding that "experienced" escrow officer did not exercise discretion and independent judgment because he was bound to follow set guidelines and instructions in determining if title could be transferred at closing and applied his knowledge in following prescribed procedures to determine whether specified standards were met). Accordingly, this Court finds that the Hearing Officer's threshold determination that Ms. Cardono was not employed by Dr. Dubois' medical practice as an "employee employed in a bona fide administrative capacity" is not affected by error of law and is not clearly erroneous.
 B Applicability of the "Unclean Hands" Doctrine
Next, Dr. Dubois argues that the Hearing Officer's decision is affected by error of law because she improperly evaluated Ms. Cardono's criminal conviction when fashioning an appropriate remedy for Ms. Cardono's claim for unpaid wages. It is Dr. Dubois' contention that the Hearing Officer was required to find that the doctrine of "unclean hands" is fully operative on these facts and functions as a complete bar to Ms. Cardono's claim for unpaid overtime and vacation pay. Ms. Cardono posits that the doctrine is inapplicable and that the Hearing Officer erred in applying the doctrine to partially reduce her recovery against Dr. Dubois.
The Hearing Officer's determination that the "unclean hands" functions is a partial bar to Ms. Cardono's recovery is not binding on this Court; rather, this question of law will be reviewed denovo. See State Dep't of Environmental Mgmt.,799 A.2d at 277. It is well-settled in Rhode Island that "the doctrine of unclean hands `becomes operative only when a complainant must depend on his own improper conduct to establish his [or her] rights against the other parties to the suit.'" School Comm. ofthe *Page 27 City of Pawtucket v. Pawtucket Teachers Alliance, LocalNo. 930, AFT, AFL,101 R.I. 243, 257, 221 A.2d 806, 815 (1966) (quoting Cirillo v.Cirillo, 77 R.I. 223, 226, 74 A.2d 440, 442 (1950)). However, the question of whether the doctrine of "unclean hands" is a valid defense — in whole or in part — to a claim of unpaid wages under the FLSA is less clearly settled in this State. Accordingly, this Court will look for guidance from other jurisdictions.
Of the few published decisions in this area, McGlothan v.Wal-Mart Stores, Inc., 2006 WL 1679592 (M.D.Fla.), gives the issue more than a cursory treatment. In McGlothan, the plaintiff, relying primarily on the Supreme Court of the United States' decision in McKennon v. Nashville Banner PublishingCo., 513 U.S. 352 (1995), argued that "the unclean hands defense is unavailable where a private suit serves an important public purpose." Id. at 2. From this general proposition, the plaintiff argued that his suit to enforce the overtime provisions of the FLSA "serve[d] an important public purpose and, therefore, the affirmative defense [of unclean hands] should be stricken" from the defendant's answer. Id.
Likening the "unclean hands" doctrine to the defense of "after-acquired evidence of wrongdoing" in the employment discrimination context because "both defenses serve the same general purpose — to prevent a plaintiff from wrongfully profiting from misconduct," the McGlothan Court held that the doctrine of unclean hands was a valid defense to a claim under the FLSA and that courts "should, at a minimum, take into account plaintiff's alleged misconduct when analyzing remedies." Id. at 3. However, the McGlothan Court's holding was narrow and did not address the issue of "whether the doctrine of unclean hands bars all right of recovery in this case." Id. *Page 28 
To date, only two courts have relied on the McGlothan
decision for the proposition that the doctrine of "unclean hands" is a valid defense to FLSA claims under some circumstances. SeeKendrick v. Alternative Care, Inc., 2006 WL 4756451 (M.D.Fla.) ("McGlothan may be read to endorse the view that unclean hands may be applicable in FLSA cases — in narrow and limited circumstances."); Blanc v. Safetouch, Inc., 2008 WL 4059786 (M.D.Fla.) ("The unclean hands defense allows courts to take into account a plaintiff's wrongdoing when analyzing remedies in a FLSA action."); Curry v. High Springs FamilyPractice Clinic and Diagnostic Center, Inc., 2008 WL 5157683 (N.D.Fla.) ("As a matter of law, the affirmative defense of unclean hands may be a sufficient affirmative defense to a FLSA claim in some cases."). However, these courts, when confronted with evidence that the party seeking unpaid wages has "unclean hands," did not take the additional step of determining whether the doctrine of "unclean hands" functions as a partial or complete bar to recovery.
The holding and reasoning employed in McGlothan are consistent with the animating principle behind the "unclean hands" doctrine as that doctrine has been consistently applied in Rhode Island. Noted our Rhode Island Supreme Court:
 the court must [not] close its eyes to the fraud of [a party]. . . . To [do so] . . . would require the court to assist in making the fraud complete. [A party] cannot take a legal advantage of [his or] her own wrong. The court will not lend its aid to one guilty of fraud. Silva v. Merritt Chapman Scott Corp., 52 R.I. 30, 156 A. 512, 514 (1931).
If a court is confronted with evidence that an employee claiming unpaid wages under the FLSA has engaged in fraudulent conduct and the employer has satisfactorily demonstrated that the employee's work-related wrongdoing is directly related to the time period for which unpaid wages are sought, the court would effectively "close its eyes to *Page 29 
the fraud" if it ignored this evidence when fashioning an appropriate remedy. To hold that the "unclean hands" doctrine is inapplicable in the FLSA context would have a perverse result: employees would be able to engage in fraudulent conduct while "on the clock," secure in the knowledge that they will ultimately be compensated for the time and effort spent engaging in such conduct if they prevail on an FLSA claim. Accordingly, this Court finds that the "unclean hands" doctrine is a valid defense to FLSA claims for unpaid wages where, as here, the employer demonstrates that the former employee engaged in work-related misconduct and this conduct is directly related to the claim for unpaid wages asserted by the employee.
Having rejected Ms. Cardono's contention that the "unclean hands" doctrine has no applicability in the FLSA context, this Court must still address Dr. Dubois' contention that the doctrine functions as a complete bar to her recovery. Those courts that have followed the lead of McGlothan have declined to reach this issue.
In considering the applicability of the "unclean hands" doctrine, the Hearing Officer fashioned a compromise: in her discretion, the Hearing Officer concluded that Ms. Cardono could recover unpaid wages for those months in which there was no evidence that she was fraudulently obtaining controlled substances and she was barred from recovering wages for those months in which she had engaged in one or more illegal acts. (Hearing Officer's Dec. at 7-8.) This Court believes that the approach ultimately adopted by the Hearing Officer — one that strikes the appropriate balance between the important public purpose served by the FLSA's overtime provisions and the important public purpose served by the "unclean hands" doctrine — is not arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. *Page 30 
While an employee should not be allowed to "take legal advantage of [his or] her own wrong" when seeking to recover for unpaid wages,Silva, 52 R.I. at 30, 156 A. at 514, he or she must be allowed to recover the unpaid wages to which he or she is legally entitled under the FLSA. To apply the "unclean hands" doctrine as a complete bar to recovery would disrupt the delicate balance struck by the Hearing Officer, as it would allow even a single incident of employee misconduct committed on the job to outweigh an otherwise exemplary employment history when considering whether an employee is entitled to unpaid wages. Accordingly, the "unclean hands" doctrine, while not a complete bar to recovery under the FLSA, is one factor among many that may be considered when fashioning an appropriate remedy.
 C Sufficiency of the Hearing Officer's Decision
Dr. Dubois also attacks the evidentiary underpinnings of the Hearing Officer's decision on Ms. Cardono's claim for unpaid wages, alleging that her credibility determinations are characterized by abuse of discretion. Specifically, Dr. Dubois asserts that the Hearing Officer abused her discretion in choosing to credit Ms. Cardono's hearing testimony that she dutifully recorded her vacation and overtime hours on loose sheets of paper and then transferred this information to her calendars. Dr. Dubois points to the "Judgment and Disposition" form that was entered into evidence at the hearing to impeach Ms. Cardono's credibility and argues that Ms. Cardono's hearing testimony, by virtue of her "unclean hands," was unworthy of credence by the Hearing Officer.
In reviewing the decision of an administrative agency, this Court may "not substitute its judgment for that of the agency in regard to the credibility of the witnesses or the weight of the evidence concerning questions of fact." Costa v. Registrar of Motor *Page 31 Vehicles, 543 A.2d 1307, 1309 (R.I. 1988). Here, the Hearing Officer was explicit in her written decision that she found the evidence and testimony of Ms. Cardono "persuasive on the number of vacation days she earned per year." (Hearing Officer's Dec. at 7.) The Hearing Officer made clear that she did not accept Dr. Dubois' characterization of Ms. Cardono's hearing testimony as "worthless" simply because she had been convicted of a crime involving fraudulent conduct. (Hearing Officer's Dec. at 8.)
The Hearing Officer found Ms. Cardono's hearing testimony that "she was instructed to keep track of her overtime hours and her vacation by the office manager, [Ms. Vadnais]" to be "credible"Id. The Hearing Officer also chose to credit Ms. Cardono's testimony that "she was repeatedly told by [Ms.] Vadnais that her vacation time and overtime accrued and would be paid out when she ceased working for [Dr.] Dubois or when [Dr.] Dubois retired."Id. Additionally, the Hearing Officer chose to discount the hearing testimony of Ms. Vadnais — testimony that the Hearing Officer found inconsistent and "less than forthcoming."Id. Likewise, the Hearing Officer found that Dr. Dubois was not a credible witness because, "[w]ith full knowledge of the [illegal] acts [Ms. Cardono] committed, he continued to employ her. After learning of her transgressions he . . . did not find that [Ms.] Cardono's wrongdoing merited termination." Id.
Therefore, as this Court did not have an opportunity to view the live hearing testimony of Ms. Cardono, Ms. Vadnais, and Dr. Dubois, it would be impermissible to second-guess the Hearing Officer's impressions as she observed the three witnesses, listened to their testimony, and determined what to accept and what to disregard.See Environmental Scientific Corp. v. Durfee,621 A.2d 200, 206 (R.I. 1993) ("The trial judge's impressions as he or she observes a witness and listens to testimony are all *Page 32 
important to the evidence sifting which precedes a determination of what to accept and what to disregard. Observations of live testimony necessarily enter into a determination of what the trial judge believes and disbelieves.") (internal citations and quotations omitted.)
Dr. Dubois also asserts that the Hearing Officer's decision is not supported by reliable, probative, and substantial record evidence. Specifically, he alleges that the calendars and other supporting documentation submitted by Ms. Cardono are not legally competent because they do not strictly conform to the Rhode Island Rules of Evidence. According to Dr. Dubois, the calendars admitted into evidence were not properly authenticated and constitute inadmissible hearsay that does not fall within any recognized exception to the rule against hearsay.
With respect to the issue of authentication, the Hearing Officer found that "the calendars were properly introduced into evidence" because "[Ms. Cardono] testified on both days of [the] hearing as to how the dates and times were put onto the calendars. . . . She testified [that] she recorded her daily hours on a sheet of paper or a five-by-seven card that she kept under her keyboard. She then clipped these papers to her calendar book and would transfer the information when she had the time." (Hearing Officer's Dec. at 4-5.) The Hearing Officer's authentication determination is amply supported by legally competent evidence in the record that the calendars are "what [the] proponent claim[ed]." R.I. R. Evid. 901.
With respect to the allegation by Dr. Dubois that the contents of the calendars constitute inadmissible hearsay not within a recognized exception, the Hearing Officer did not address specifically the issue of whether the calendars introduced into evidence *Page 33 
were admissible pursuant to "[t]he rules of evidence as applied in civil cases in the superior courts of this state . . .," or whether the calendars, while "not admissible under those rules" could be submitted as "necessary to ascertain facts not reasonably susceptible to proof under those rules" and were "of a type commonly relied upon by reasonably prudent men and women in the conduct of their affairs." G.L. 1956 § 42-35-10. In choosing to rely on the calendars in rendering her decision, the Hearing Officer explained,
 I am satisfied that [Ms.] Cardono kept contemporaneous records on the hours she worked for [Dr.] Dubois. These records were transferred at a later date to the calendars that [Ms.] Cardono submitted into evidence. This does not diminish the reliability of those calendars. The calendars are appropriate for consideration and speak for themselves. They are very clear on the hours per day that Cardono worked and the overtime hours per week she is claiming. (Hearing Officer's Dec. at 5.) (Emphasis added.)
The Hearing Officer's focus on the contemporaneous nature of Ms. Cardono's evidentiary proffer suggests — but does not lead inexorably to — the conclusion that the Hearing Officer found that the notations on the calendars constituted hearsay, albeit hearsay within the so-called "business record exception" to the hearsay rule set forth in Rule 803. This approach to employee notations on desk calendars is similar to that employed by the United States Court of Appeals for the Seventh Circuit in U.S.v. Ramsey,785 F.2d 184, 192 (7th Cir. 1986). InRamsey, the plaintiff started taking notes on his desk calendar to keep track of his regular calls to a particular business, but kept few other notes on his calendars. Id. The court, allowing the plaintiff's calendars into evidence as a business record, found that they were reliable because they had been "compiled consistently and conscientiously." Id. While theRamsey Court *Page 34 
acknowledged that "[o]ccasional desk calendars, in which entries may or may not appear at the whim of the writer, do not have the sort of regularity that supports a reliable inference, [t]his is not to say that desk calendars never may be business records; they may, if they are maintained regularly, without regard to the events subject to the trial, and there is a demonstrable pattern of inclusion or exclusion." Id.
Even assuming arguendo that the calendars constitute hearsay not within a recognized exception to the hearsay rule, the Hearing Officer's decision to consider the calendars is not otherwise affected by error of law. As the Rhode Island Supreme Court reaffirmed in DePasquale v. Harrington,599 A.2d 314, 316-317 (R.I. 1991),
 [t]here is surely some tension between the ability of an expert administrative agency to consider hearsay evidence, as allowed by § 42-35-10 . . ., and the need to ensure that such a body act upon reliable evidence. Hearsay evidence may vary significantly in its credibility and probative value, depending on its source and its similarity to evidence that is intrinsically trustworthy. . . . In this vein the provisions of § 42-35-10 . . . limit the sort of hearsay evidence admissible in administrative proceedings to that `necessary to ascertain facts not reasonably susceptible of proof under [the rules of evidence as applied in civil cases in the Superior Courts of Rhode Island] if it is a type commonly relied upon by reasonably prudent men in the conduct of their affairs.
While the DePasquale Court recognized that "[t]his is a somewhat imprecise standard of competency, . . . it is a realistic one" in the administrative context. Id. at 317. The Court explained:
 An expert administrative tribunal concerned with advancing the public welfare should not be rigidly governed by rules of evidence designed for juries. The Rhode Island Rules of Evidence are to provide the usual and most helpful standard for a hearing officer in adjudging the competency of evidence. However, a hearing officer may take into account evidence that would be excluded from a trial by jury if it would be prudent to do so, given *Page 35 the requirements of the statute being enforced. Such a balancing between inherent reliability and requisite efficiency, as embodied in § 42-35-10 . . ., is sensible in light of everyday experience. Prudent persons regularly rely upon hearsay information in determining matters of their most important private concerns. Id. (Emphasis added.)
The Department impliedly acknowledged in its memorandum of law that the Hearing Officer, in considering Ms. Cardono's evidentiary proffer of the calendars, was relying on evidence that would not be admissible pursuant to "[t]he rules of evidence as applied in civil cases in the superior courts of this state. . . ." Section 42-35-10. However, the Department also made clear that given the requirements of the statutory scheme being enforced, it was reasonable and prudent for the Hearing Officer to consider the calendars. The Department explained in its memorandum of law:
 In the Department's experience processing labor standards claims, employees often track their hours on calendars when their employer does not provide another timekeeping record system. Employers regularly submit to the Department computer-generated records showing dates and hours worked for specific employees gleaned from individual time cards. Similarly, [Ms.] Cardono kept contemporaneous timekeeping records that, later, were memorialized on a [set of] calendar[s]. . . . [T]he Department, in its discretion, determined that the records were credible and of a type relied upon by employers and employees and that . . . the records "speak for themselves." (Dept.'s Mem. of Law at 3.)
Accordingly, this Court is satisfied that the Hearing Officer's decision to admit the calendars into evidence at the hearing did not substantially prejudice the rights of Dr. Dubois.
 D The Scope of Ms. Cardono's Complaint for UnpaidWages *Page 36 
Finally, Dr. Dubois and Ms. Cardono, albeit for different reasons, assert that the Hearing Officer improperly considered the complaint that Ms. Cardono submitted to the Department when evaluating her claim for unpaid wages. Dr. Dubois maintains that the Hearing Officer's decision is in violation of constitutional provisions and affected by error of law because the Hearing Officer, when confronted with a complaint indicating that Ms. Cardono was claiming unpaid wages for the period between 1997 and 2000, allowed Ms. Cardono to offer evidence and testimony at the hearing with respect to unpaid wages allegedly owed to her for a period of time beyond that contemplated in the complaint. According to Dr. Dubois, the Hearing Officer's decision to allow Ms. Cardono to offer this evidence was in violation of his due process rights, as he did not have prior notice of this additional period of time for which unpaid wages were being sought. Ms. Cardono, on the other hand, argues that the Hearing Officer's decision is affected by error of law and clearly erroneous in view of the reliable, probative, and substantial record evidence. It is Ms. Cardono's position that the record contains legally competent evidence that she is owed unpaid wages for the entirety of her employment with Dr. Dubois' medical practice; as such, she contends that the Hearing Officer's decision to limit her recovery to the period between 2004 and 2007 is affected by error of law.
Dr. Dubois' argument that he lacked notice of the period of time for which Ms. Cardono was seeking unpaid wages is unavailing. The "Non-Payment of Wages Complaint Form" that Ms. Cardono submitted to the Department on January 31, 2007, in the section designated "What dates did you work for the money which you claim you are owed," clearly lists the following in Ms. Cardono's handwriting: "From June 1995 to *Page 37 
Jan[uary] 2007." (Ms. Cardono's Compl. to Department, 1/31/07.) Even if Dr. Dubois did not have notice of the precise dates upon which Ms. Cardono allegedly accrued overtime and vacation, he certainly had been put on notice that Ms. Cardono was claiming unpaid wages for the entire duration of her employment with his practice.See Resendes v. Brown, 966 A.2d 1249, 1254 (R.I. 2009) ("At a minimum, due process requires that notice be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.") (Internal quotations omitted.) Thus, this Court is satisfied that the Hearing Officer's decision did not substantially prejudice Dr. Dubois' due process rights.
Ms. Cardono's assertion that the Hearing Officer ignored reliable, probative, and substantial evidence in the record that she accrued unpaid wages prior to 2004 and erred in limiting her recovery to the three years prior to the filing of her complaint is without merit. Pursuant to G.L. 1956 § 28-14-20, "[a]ll claims for wages due must be filed with the director [of labor and training] within three years from time of services rendered by an employee to his or her employer." The record before this Court reflects that Ms. Cardono filed her claim for unpaid wages on January 31, 2007. In evaluating her complaint, the Hearing Officer was required to evaluate all of the "services rendered by [Ms. Cardono] to her employer," Dr. Dubois, for the three year period prior to the filing of the complaint. Thus, while the Hearing Officer could have found based on the record evidence that Ms. Cardono's overtime and vacation time began accruing in 1995, she was statutorily limited in her consideration of Ms. Cardono's claim to the three year period preceding the filing of the complaint. Accordingly, this Court concludes that the Hearing *Page 38 
Officer's decision to limit her inquiry to the three years preceding the January 31, 2007 filing date was not affected by error of law or in violation of statutory provisions.
 Conclusion
Having reviewed the entire record before it, this Court is satisfied that the Hearing Officer's decision is not in violation of constitutional provisions, affected by error of law, clearly erroneous in view of the reliable, probative, and substantial record evidence, arbitrary or capricious or characterized by an abuse of discretion. Substantial rights of Dr. Dubois and Ms. Cardono have not been prejudiced. Accordingly, the decision of the Hearing Officer is affirmed.
Counsel shall submit the appropriate judgments for entry.
[1] Ms. Cardono initially testified that she received her "three-week vacation check" on November 29, 2009. However, counsel for Ms. Cardono presented her with a copy of the vacation check, and once Ms. Cardono's recollection had been sufficiently refreshed, she testified that the check had actually been issued to her on December 29, 2009. (Tr. 12/12/07 at 28.)
[2] Counsel for Dr. Dubois presented Ms. Cardono with a document entitled "Judgment and Disposition" that read, in pertinent part: "The defendant entered a plea of nolo contendere to one count of obtaining controlled substances by fraud." (Tr. 12/12/07 at 76.) The document also revealed that Ms. Cardono had received five years of probation and had been assessed a fine of $788.Id.
[3] The Hearing Officer was referring to the Rhode Island Supreme Court's recent decision in Arnold v. Lebel,941 A.2d 813, 821 (R.I. 2007), wherein the Court held that "[u]nless the parties are given notice and an opportunity to respond on the record, including cross-examination, if appropriate, a . . . hearing officer may not communicate with anyone, including [agency] staff members, about contested adjudicatory facts. . . ." TheArnold Court went on to state:
 All facts and opinions, including opinions of agency professionals and staff, as well as information obtained from an outside source, such as medical texts or the Internet, must be included on the record if the hearing officer plans to base his final decision on such facts. In short, no litigious facts should reach the decision-maker off the record in an administrative hearing. Id.
[4] The Hearing Officer found that Ms. Cardono had accrued a total of sixteen weeks of vacation, with four weeks of vacation time for each year that she worked for Dr. Dubois for the period between 2003 — 2006. She then deducted nine weeks from this total because Ms. Cardono "was paid for or took as vacation" these weeks. As such, the Hearing Officer calculated that Ms. Cardono was "owed the balance of seven weeks as vacation pay." (Hearing Officer's Dec. at 7.) The Hearing Officer did not consider vacation time accrued before 2003 because it was outside the three year statute of limitations. See
G.L. 1956 § 28-14-20 ("All claims for wages due must be filed with the director within three (3) years from time of services rendered by an employee to his or her employer.").
[5] Reviewing the list of prescriptions and dates that had been submitted into evidence at the March 25, 2008 hearing, the Hearing Officer found that Ms. Cardono "made one call in 2004, in December. In 2005 she made calls every month, ranging from eight per month to twenty-six per month. In 2006 she made calls for the months January through July, ranging from thirteen per month to twenty-six per month. Applying the doctrine of unclean hands, . . . [Ms.] Cardono is not entitled to overtime for the months she made phone calls" to illegally obtain prescription medications." (Hearing Officer's Dec. at 7-8.)
[6] The Hearing Officer computed the amount of overtime and vacation owed to Ms. Cardono as follows:
 [I]t is hereby determined that [Ms. Cardono] should be paid 7 weeks of vacation time at $765 per week for a total of $5355. [Ms. Cardono] is owed overtime wages for February 2004 through and including November 2004, and August 2006 through and including December 2006. [Ms. Cardono] will not be paid overtime wages for the period December 2004 through and including July 2006 pursuant to the doctrine of unclean hands.
 In 2004 [Ms.] Cardono was working 40 hours per week and earning $730 per week. Pursuant to [G.L. 1956] § 28-12-4.1 she is owed one and one half times the regular rate of pay for hours worked over 40 [hours] per week. Therefore, her hourly overtime rate is owed $27.38. For the period February 2004 through November 2004 she worked overtime for 280 hours and 15 [minutes] and is owed $7673.25.
 In 2006 [Ms.] Cardono was working 37.5 hours per week and earning $765 per week. She will be paid at the normal rate of $20.40 per hour for the hours worked between 37.5 and 40 hours and one and one half times the regular rate, or $30.60, for hours worked over 40 hours. For the period August 2006 through December 2006 she worked 45 hours and 15 minutes at the $20.40 rate for a total of $923.10 and 100 hours at the rate of $30.60 for a total of $3060.
 The total due [Ms.] Cardono for vacation and overtime pay is $17,011.35 minus the normal deductions. (Hearing Officer's Dec. at 10-11.)
On August 29, 2008, Dr. Dubois filed a motion to stay the enforcement of the Hearing Officer's decision. The matter came before another Justice of this Court on September 11, 2008, and, as no objection had been filed, the motion for a stay of enforcement was granted on September 15, 2008.
[7] Black's Law Dictionary defines "accounting" as "[t]he act or a system of establishing or settling financial accounts; esp[ecially] the process of recording transactions in the financial records of a business and periodically extracting, sorting, and summarizing the recorded transactions to produce a set of financial records. Black's Law Dictionary
21 (8th ed. 2004).
[8] Black's Law Dictionary defines "audit" as "a[n] . . . examination of an individual's or organization's accounting records, financial situation, or compliance with some other set of standards." Black's Law Dictionary
140 (8th ed. 2004).
[9] Black's Law Dictionary defines "insurance" in the health and medical context as "[i]nsurance covering medical expenses resulting from sickness or injury." Black's Law Dictionary
817 (8th ed. 2004).
[10] Black's Law Dictionary defines the term "compliance," as it relates to auditing, as "[a]n audit conducted by . . . a third party to assess compliance with one or more sets of laws and regulations." Black's Law Dictionary
140 (8th ed. 2004).